**HOLMES, ATHEY, COWAN & MERMELSTEIN LLP**
Andrew B. Holmes (SBN: 185401)
abholmes@holmesathey.com
Andrew S. Cowan (SBN: 165435)
acowan@holmesathey.com
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017
Tel: (213) 985-2200
Fax: (213) 973-6282

Attorneys for Plaintiffs *Breanne Ashley Freeman, Joel B. Freeman, Kevin M. Christian, Linda D. Christian, Chase A, Gibson, Felicia D. Gibson, Nathan D. DeTracy, Jennifer DeTracy, John Patrick Dwyer Jr., Christine Dwyer, John David Jeffrey Folsom, Micah Dannan Folsom, Thomas Brad Foster, Ericka R. Foster, James Hicks, Lara Hicks, Stephen Roger Innis, Jaime Rose Innis, Josh Nathanael Johnson, Season Marie Johnson, Karl McAllister, Melissa McAllister, Nathan Wesley Moore, Dana Joanne Moore, Eric Pardue, Kristen M. Pardue, Lisa M. Price, Joshua L. Spencer, and Melinda M. Spencer*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BREANNE ASHLEY FREEMAN, an individual; JOEL B. FREEMAN, an individual; KEVIN M. CHRISTIAN, an individual; LINDA D. CHRISTIAN, an individual; CHASE A. GIBSON, an individual; FELICIA D. GIBSON, an individual; NATHAN D. DETRACY, an individual; JENNIFER DETRACY, an individual; JOHN PATRICK DWYER JR., an individual; CHRISTINE DWYER, an individual; JOHN DAVID JEFFREY FOLSOM, an individual; MICAH DANNAN FOLSOM, an individual; THOMAS BRADLEY FOSTER, an individual; ERICKA R. FOSTER, an individual; JAMES HICKS, an individual; LARA HICKS, an individual; STEPHEN ROGER INNIS, an individual; JAIME ROSE INNIS, an individual; JOSH NATHANAEL JOHNSON, an individual; SEASON MARIE JOHNSON, an | Case No. **COMPLAINT FOR DAMAGES** **DEMAND FOR JURY TRIAL** |

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

individual; KARL MCALLISTER, an individual; MELISSA MCALLISTER, an individual; NATHAN WESLEY MOORE, an individual; DANA JOANNE MOORE, an individual; ERIC PARDUE, an individual; KRISTEN M. PARDUE, an individual; LISA M. PRICE, an individual; JOSHUA L. SPENCER; an individual; and MELINDA M. SPENCER, an individual,

            Plaintiffs,

     vs.

PENN MUTUAL LIFE INSURANCE COMPANY; WINTRUST LIFE FINANCE; RANDALL SCOTT BOLL, an individual; DEWANE LEWIS, JR., an individual; CROSSLIN PLLC; PLURIS VALUATION ADVISORS LLC; ESPEN ROBAK, an individual; KALICKI COLLIER LLP; LAW OFFICES OF OSHINS & ASSOCIATES, LLC; OXFORD RISK MANAGEMENT GROUP; STRATEGIC RISK ALLIANCE, A/K/A SRA 831(b) ADMIN; and DOES 1-50

            Defendants.

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## I.    **INTRODUCTION**

1.    This case is principally brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, as it involves a pattern of racketeering activity arising from a scheme to defraud twenty-nine (29) victim plaintiffs.

2.    The fraudulent scheme operated as follows: Defendants made materially false statements in order to sell plaintiffs personal life insurance and related products. In particular, defendant falsely told plaintiffs that they could save (or even make) money by utilizing various purportedly tax-advantaged strategies involving life insurance and other related products. Unbeknownst to the Plaintiffs, these tax avoidance and related scams were a sham and their purported tax advantages illusory and/or illegal.

3.    Defendants reaped substantial profits, bonuses, commissions and fees from the sale of the insurance policies, related loans, and other related products and services. Plaintiffs never received the promised tax and other benefits, which were illusory. As a result, plaintiffs lost substantial sums of money due to the large sums they paid defendants for insurance premiums, loan interest, other fees charged by defendants, and other consequential damages.

4.    The mastermind of this fraudulent scheme was defendant RANDALL SCOTT BOLL ("BOLL"), who (among other things) was an appointed insurance agent for defendant PENN MUTUAL LIFE INSURANCE COMPANY ("PENN"), which underwrote and sold the life insurance policies. In December 2021, BOLL was indicted in this judicial district on federal charges of money laundering and other crimes. After initially being indicted for money laundering, in July of 2022, BOLL pleaded guilty in federal court to a felony charge of conspiracy to cause a financial institution to fail to file currency transaction reports and to structure financial transactions in violation of 18 U.S.C. § 371 and 31 U.S.C. §§ 5324(a)(1), (a)(3).

5.    Each of the defendants knowingly participated in and furthered the fraudulent scheme. Such conduct included joint marketing and promotion of the sham tax avoidance strategies, the creation of phony and inflated valuations of plaintiffs' net worth

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

in order to "satisfy" underwriting requirements; the creation of sham business entities for the ostensible purpose of investing in the insurance policies and generating tax deductions; and phony valuations of sham transactions in order to "satisfy" IRS requirements.

6.     As discussed below in greater detail, defendants marketed and sold these schemes to the victim plaintiffs through numerous interstate wire communications that contained and/or furthered false representations and material omissions. They also transmitted in interstate commerce numerous false documents, such as materially false valuations of plaintiffs' net worth, all in furtherance of this scheme. As a result of this fraud, defendants reaped substantial profits at the expense of plaintiffs, who suffered substantial financial losses.

7.     Each victim plaintiff also has supplemental claims arising under state law against various of the defendants, as set forth below.

## II.    **JURISDICTION AND VENUE**

8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964. This Court has personal jurisdiction over defendants pursuant to 18 U.S.C. § 1965(b) and (d), because each defendant transacts its affairs in this district. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The amount in controversy exceeds $75,000 for plaintiffs, exclusive of costs and interest.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over each defendant pursuant to 18 U.S.C. § 1965(b) and (d), and the defendants are subject venue here as there is no district in which an action may otherwise be brought pursuant to 28 U.S.C. § 1391(b)(1) or (2). Venue is also proper under 18 U.S.C. § 1965(a) because all defendants transacted business in this district.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### III.   PARTIES

**A.    Plaintiffs**

10.    Plaintiff BREANNE ASHLEY FREEMAN is an individual who resides in the Central District of California.

11.    Plaintiff JOEL B. FREEMAN is an individual who, at the time of entering into the various transactions described herein, resided in the Central District of California.

12.    Plaintiffs KEVIN M. CHRISTIAN and LINDA D. CHRISTIAN are individuals, married to one another, who reside in the state of Texas.

13.    Plaintiffs CHASE A. GIBSON and FELICIA D. GIBSON are individuals, married to one another, who reside in the state of Texas.

14.    Plaintiffs NATHAN D. DETRACY and JENNIFER DETRACY are individuals, married to one another, who, at all times relevant to this action resided in the state of Washington, but who are now resident in Arizona.

15.    Plaintiffs JOHN PATRICK DWYER JR. and CHRISTINE DWYER are individuals, married to one another, who reside in the state of Texas.

16.    Plaintiffs JOHN DAVID JEFFREY FOLSOM and MICAH DANNAN FOLSOM are individuals, married to one another, who reside in the state of Idaho.

17.    Plaintiffs THOMAS BRADLEY FOSTER and ERICKA R. FOSTER are individuals, married to one another, who reside in the state of Virginia.

18.

19.    Plaintiffs JAMES HICKS and LARA HICKS are individuals, married to one another, who reside in the state of Ohio.

20.    Plaintiffs STEPHEN ROGER INNIS and JAIME ROSE INNIS are individuals, married to one another, who reside in the state of Michigan.

21.    Plaintiffs JOSH NATHANAEL JOHNSON and SEASON MARIE JOHNSON are individuals, married to one another, who reside in the state of Oregon.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

22.    Plaintiffs KARL MCALLISTER and MELISSA MCALLISTER are individuals, married to one another, who reside in the state of Texas.

23.    Plaintiffs NATHAN WESLEY MOORE and DANA JOANNE MOORE are individuals, married to one another, who, at the time of entering into the various transactions described herein, resided in the state of Wisconsin, but who now reside in the state of Florida.

24.    Plaintiffs ERIC PARDUE and KRISTEN M. PARDUE are individuals, married to one another, who reside in the state of Tennessee.

25.    Plaintiff LISA M. PRICE is an individual who resides in the state of Tennessee.

26.    Plaintiffs JOSHUA L. SPENCER and MELINDA M. SPENCER are individuals, married to one another, who reside in the state of Texas.

**B.    Defendants**

27.    Defendant PENN MUTUAL LIFE INSURANCE COMPANY ("PENN") is a Delaware corporation, with principal offices located in Horsham, Pennsylvania. At all times hereto, LEWIS was a Managing Partner of PENN, as well as its actual and appointed agent, and was based in its local office in Brentwood, Tennessee,[1] until PENN relocated that office to Nashville, Tennessee in May of 2024.

28.    Defendant WINTRUST LIFE FINANCE ("WINTRUST"), with principal offices in Newark, New Jersey, is a division of Lake Forest Bank and Trust Company, N.A. ("Lake Forest Bank"), which is a nationally chartered bank with a principal place of business in Lake Forest, Illinois. Lake Forest Bank is a wholly owned subsidiary of Wintrust Financial Corporation, which is an Illinois corporation with its principal place of business in Rosemont, Illinois, and is publicly traded on the Nasdaq Global Select Market with stock ticker symbol WTFC.

---

[1] PENN also uses several trade names for its various services, including "PS&G Financial Partners," which is now known as "1847 Financial" – apparently as a call-back to PENN's founding in 1847.

29. Defendant RANDALL SCOTT BOLL ("BOLL") is an individual who lived in Tennessee until his federal money laundering indictment and arrest, but as of January of 2024, resided in Rio Verde, Arizona. At all relevant times, BOLL held himself out as having at least the following professional designations: CFP, ChFC, CLU, CRPS, CLTC, and TEP. Further, at all relevant times, BOLL was a principal of CROSSLIN (or its predecessor), was an insurance producer licensed in numerous states, and was an actual and appointed career agent of PENN, identified as a "Penn Mutual Financial Professional" working through the PENN office run by LEWIS. BOLL also served as an unlicensed loan broker on behalf of, and at the direction of, defendant WINTRUST.

30. Defendant DEWANE LEWIS, JR. ("LEWIS") is an individual residing in Lebanon, TN. Since 2016, LEWIS has been a managing partner and principal with PENN. At all relevant times, LEWIS was the Managing Partner and principal of the Brentwood (now Nashville), Tennessee PENN agency.

31. Defendant CROSSLIN PLLC ("CROSSLIN") is a public accounting firm located in Nashville, TN. In or around August of 2021, CROSSLIN merged with TBH Tax, a Wyoming-based accounting firm founded by BOLL. CROSSLIN acquired all of the business of TBH Tax, and absorbed its approximately 31 employees across multiple states. Following the merger, defendant BOLL became a Principal of Tax Strategy and Asset Protection Planning at CROSSLIN. At all times herein, references to conduct by "CROSSLIN" encompass conduct by its predecessor entity TBH Tax (and any predecessor to TBH Tax).

32. Defendant PLURIS VALUATION ADVISORS LLC ("PLURIS") is Limited Liability Corporation with offices in San Franciso, CA and New York, NY. Espen Robak is the President of PLURIS. According to its website,[2] among other things, PLURIS "[s]erves the needs of high net worth individuals or families that need valuations

---

[2] Website accessed 11/22/24, at https://pluris.com/who-we-serve/private-clients/

COMPLAINT

primarily for tax purposes. This includes private clients engaged in estate planning or charitable gifting."

33.    Defendant ESPEN ROBAK ("ROBAK") is President and founder of PLURIS, and holds a Chartered Financial Analyst ("CFA") designation. ROBAK worked with KALICKI to value the charitable LLCs used in the RICO scheme.

34.    Defendant KALICKI COLLIER LLP ("KALICKI") is a Reno, NV-based law firm that worked with PLURIS and ROBAK, and provided legal services to (or at the direction of) BOLL with regard to the creation and maintenance of the LLCs used in the RICO scheme.

35.    Defendant LAW OFFICES OF OSHINS & ASSOCIATES, LLC ("OSHINS") is a Las Vegas, NV-based law firm that provided legal services to (or at the direction of) BOLL with regard to the creation and maintenance of the LLCs used in the RICO scheme.

36.    Defendant OXFORD RISK MANAGEMENT GROUP ("OXFORD") is a Sparks, MD-based entity that states on its website that it is "The Leading Provider of Captive Insurance Services."[3] OXFORD worked with BOLL in the RICO scheme.

37.    Defendant STRATEGIC RISK ALLIANCE, a/k/a SRA 831(b) ADMIN ("SRA") is an Eagle, ID-based entity that states on its website that it is "Helping small and mid-size businesses build 831(b) Micro Captive Plans to mitigate risk and strategically defer taxes."[4] SRA worked with BOLL in the RICO scheme.

## IV.    FACTUAL ALLEGATIONS

### A.    The Racketeering Enterprise

38.    Based upon plaintiffs' current knowledge, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, KALICKI, PLURIS, ROBAK, and OSHINS constituted a group of persons and entities associated in fact, hereinafter referred to in this Complaint

---

[3] Website accessed 12/15/24, at https://www.oxfordrmg.com/
[4] Website accessed 12/15/24, at https://www.831b.com/

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

as the "High-Premium Insurance Enterprise" (or "HPI Enterprise", and the participating defendants, the "HPI Enterprise Defendants").

39.    39.    The HPI Enterprise was an organization consisting of individuals and business entities associated for the common or shared purpose of selling, promoting and/or marketing high-premium life insurance policies and related products to plaintiffs through deceptive and misleading sales tactics and materials, and deriving profits from those activities.

40.    The HPI Enterprise constituted an "enterprise," as defined by Title 18, United States Code § 1961(4), that is, a group of individuals and entities associated in fact, although not a legal entity, which was engaged in, and the activities of which affected, interstate and foreign commerce. The HPI Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

**B.    Purposes of the Racketeering Enterprise**

41.    The purposes of the HPI Enterprise included, but were not limited to, the following:

a.    Marketing sham tax avoidance strategies to plaintiffs that required the plaintiffs to purchase PENN HPI policies and associated products such as premium-financed life insurance loans ("PFLI loans");

b.    Enriching PENN through premiums paid on the life insurance policies;

c.    Enriching BOLL and other individuals associated with the HPI Enterprise through commissions related to the sale of these high-premium insurance policies and/or PFLI loans.

d.    Enriching WINTRUST through interest and loan fees charged in connection with PFLI loans for HPI policies;

e.    Enriching LEWIS through premiums and/or commissions paid on HPI policies;

f. Enriching BOLL, CROSSLIN, KALICKI, PLURIS, ROBAK, OSHINS, and others associated with the HPI Enterprise through payments that established and maintained the various sham tax avoidance strategies promoted by defendants.

**C.** **Means and Methods of the Racketeering Enterprise**

42. The means and methods by which the HPI Enterprise Defendants and others conducted and participated in the affairs of the HPI Enterprise, and exerted substantial control over it, included the following:

a. Defendant BOLL, CROSSLIN, PENN, and LEWIS would promote the sale of PENN HPI policies to plaintiffs by falsely claiming they generated significant tax advantages.

b. Defendant BOLL, CROSSLIN, PENN, and LEWIS would promote sham tax deductions that he falsely claimed would enable plaintiffs to pay for PENN HPI policies they could not otherwise afford.

c. Defendants BOLL, CROSSLIN, PENN and LEWIS would jointly promote BOLL's sham tax deductions, which gave them a veneer of legitimacy due to the imprimatur of PENN, a leading national insurance company.

d. Defendant BOLL and other members and associates of the enterprise would reap high commissions (as much as 75-125% of the initial annual premium paid by the policyholder) for each HPI policy sold.

e. Defendant PENN would ignore its own underwriting guidelines by repeatedly accepting insurance applications for plaintiffs that BOLL and/or CROSSLIN prepared, which falsely inflated the net worth of plaintiffs.

f. Defendant PENN would reap huge profits from premiums paid by plaintiffs, because all of plaintiffs' policies were designed to (and in fact did) terminate long before the insureds' life expectancies.

g. Defendant CROSSLIN, to facilitate the sham tax deductions promoted by defendants BOLL, PENN and LEWIS, would represent that BOLL was a

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

qualified and reliable tax advisor, and that the sham tax deductions were lawful.

h. Defendant CROSSLIN, to facilitate the sham tax deductions promoted by defendants BOLL, PENN and LEWIS, would prepare and file tax returns on behalf of the plaintiffs that included these sham tax deductions.

i. In furtherance of one type of sham tax avoidance strategy, Defendants BOLL, CROSSLIN, PENN, LEWIS, and WINTRUST would promote PFLI loans sold by WINTRUST which they falsely claimed would enable plaintiffs to pay for PENN HPI policies they could not otherwise afford.

j. Defendants PENN, WINTRUST, CROSSLIN, BOLL and LEWIS would also develop joint marketing materials, such as brochures, presentations, and other documentation, that touted the benefits of purchasing a premium-financed HPI policy from PENN coupled with a PFLI loan from WINTRUST.

k. To facilitate the sale of the WINTRUST PFLI loans, defendant BOLL, acting in his capacity as an agent of CROSSLIN, PENN and WINTRUST, and other members and associates of the enterprise would make false statements about the tax advantages of the loans, as well as the PENN HPI policies and also misrepresent—or fail to disclose—material information required under applicable state insurance laws.

l. To facilitate the sale of the PENN HPI policies funded by WINTRUST PFLI loans, defendants BOLL, CROSSLIN, PENN, LEWIS and WINTRUST would knowingly use false and inflated valuations of the net worths of plaintiffs, which BOLL and CROSSLIN created to "satisfy" the underwriting requirements of PENN and WINTRUST.

m. Defendant WINTRUST would earn revenues from the interest associated with each PFLI loan, as well as from various fees associated with each loan.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

n. Defendant WINTRUST would cause the PENN HPI policies financed by their PFLI loans to terminate, so that WINTRUST could recoup the principal owed on its loans from the residual value of the HPI policy and/or the additional collateral posted by plaintiffs and other individuals.

o. Defendant law firms KALICKI and OSHINS would knowingly facilitate the sham tax deductions promoted by defendants BOLL, CROSSLIN, PENN and LEWIS by creating entities that would hold or manage the PENN HPI policies, and create legal documents on behalf of these entities.

p. Defendants PLURIS and ROBAK would knowingly facilitate the sham tax deductions promoted by defendants BOLL, CROSSLIN, PENN and LEWIS by creating false valuations of the assets of entities created by BOLL, in order to "satisfy" IRS requirements.

43. At all relevant times, each participant in the HPI Enterprise was aware of the scheme to induce plaintiffs to purchase PENN HPI policies and related products, was a knowing and willing participant in the scheme, and reaped profits therefrom.

44. The HPI Enterprise engaged in and affected interstate commerce because it involved activities across state boundaries, such as the marketing, promotion, advertisement and sale of the policies and associated loans or other schemes, and the receipt of premiums, interest payments, commissions, and other charges arising from the sale of the policies and related products.

**D.  The HPI Enterprise Defendants' Sham Tax Avoidance Strategies**

45. The HPI Enterprise Defendants used a prepared "menu" of purportedly legitimate and advanced tax savings strategies to generate massive fees and commissions. A true and correct copy of a representative "menu" the HPI Enterprise Defendants provided to one of the plaintiffs is attached hereto as **Exhibit A**. The HPI Enterprise Defendants used a number of these sham tax avoidance strategies to defraud the plaintiffs, as described below.

46.    HPI policies, as a type of whole life insurance, cover the entire life of the insured, in contrast to "Term" policies that cover the insured for specified periods of time.

47.    Premiums for HPI policies are substantially higher than premiums for Universal Life ("UL") and Term policies, in part because they include a guaranteed cost of insurance, as well as a guaranteed minimum cash value component. Over time, the policy accrues a cash value that is tax advantaged.

48.    HPI policies, however, carry a much greater risk of loss in the event that either the attendant PFLI loan becomes unaffordable, or the HPI policy can otherwise not be maintained by the policyholder.

49.    PENN's HPI policies generate extremely high guaranteed commissions for the agents and offices who sell them, far greater than UL, term, or lower-premium whole life policies.

50.    The HPI Enterprise Defendants, in order to reap these high HPI policy commissions and/or other fees, recommended and sold only PENN HPI policies to plaintiffs, without regard to their insurance need, net worth, or actual financial situation.

51.    The HPI Enterprise Defendants, knowing that plaintiffs could typically not actually afford the HPI policies being promoted, lured them into purchasing these HPI policies by falsely claiming that they would generate significant tax savings that would defray their high cost.

52.    Generally, life insurance premiums (and any related premium financing costs) are not tax deductible. However, the HPI Enterprise Defendants falsely told plaintiffs that they could generate deductions through some or all of the following sham tax strategies, which were all elaborate mechanisms that purportedly allowed HPI premiums to be deducted.

### 1.    Sham PFLI Loan Deductions

53.    In a PFLI Policy, the insured enters into a contract with a lender, in this case WINTRUST, to finance the PENN policy premiums. WINTRUST (the lender)

conditionally agrees to pay the policy premiums (to PENN) for a specified number of years and receives loan fees and interest in exchange.

54.    The insured (here, some of the victim plaintiffs) thereby pays "interest only" on the loan to WINTRUST instead of the full amount of the annual life insurance premium otherwise owed to PENN.

55.    The PFLI loan is secured by the surrender value of the PENN HPI policy, and by additional assets of the borrower, including cash placed on deposit with WINTRUST or its affiliates, negotiable instruments (such as CDs) held by the insured (here, some of the victim plaintiffs), as well as security interests on securities and stock accounts and other assets of the borrower. The goal of these types of arrangements is typically that, over time, the cash value of the policy grows to the point where the increased cash value of the policy will itself cover the ongoing loan interest payments. The accumulated balance of the loan is supposed to be repaid from the cash value in the policy.

56.    The HPI Enterprise Defendants' sham PFLI loan deduction strategy operated as follows: They would create an LLC for the sole purpose of owning an HPI PFLI policy, which supposedly allowed both PFLI loan interest and HPI premium payments to be tax deductible as a means to make these PFLI policies appear to be financially advantageous. However, these deductions were improper, and the purported tax benefits were illusory.

57.    While promoting purported tax benefits of PFLI loans to plaintiffs, the HPI Enterprise Defendants failed to disclose material facts, in particular, significant risks associated with such loans. Among other things, they failed to inform plaintiffs that interest rate fluctuations might make the PFLI loans too expensive to sustain, at which point the plaintiffs would default on the loan, causing a loss of their posted collateral and the cash surrender value of the HPI policy, as well as loss of all insurance and prior Interest and loan fees paid.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### 2.    Sham Charitable Life Insurance Strategy

58.    The HPI Enterprise Defendants also promoted the sale of HPI policies by falsely telling plaintiffs they would generate tax deductions through the use of charitable limited liability companies ("CLLCs").

59.    The HPI Enterprise Defendants' sham PFLI loan deduction strategy operated as follows: defendants BOLL or KALICKI would create a CLLC for the sole purpose of owning a PENN HPI policy. The CLLC would then donate 99% of its own shares to a supposed charity selected by BOLL. The HPI Enterprise Defendants falsely told plaintiffs that this would allow them to claim an immediate charitable tax deduction equal to 99% of the CLLC's value (which consisted solely of the false and inflated appraisal prepared by PLURIS and ROBAK). This was yet another means to make these HPI policies appear to be financially advantageous.

60.    In reality, the charity would receive no benefit from the purportedly donated property, rendering the supposed tax deduction invalid and illusory.

61.    In furtherance of the sham charitable life insurance strategy, defendants BOLL and KALICKI enlisted defendants PLURIS and ROBEK to knowingly create false appraisal reports to "validate" the donation as required by the IRS.

### 3.    Sham Deferred Compensation Strategy

62.    The HPI Enterprise Defendants also promoted the sale of HPI policies by falsely telling plaintiffs they would be used to establish create legitimate tax-advantaged deferred compensation strategies, such as Non-Qualified Deferred Compensation plans, Retirement Benefits Plans, Employee Benefit Plans, and/or Restricted Benefit Trusts. BOLL failed to do so.

63.    After selling the HPI policy (and collecting his commissions and fees), the HPI Enterprise Defendants typically only took the first step in establishing such plans and/or trusts. Although the HPI Enterprise Defendants typically created the initial entity (the first required step), they would fail to carry out the other legal requirements, such as:

a. the formation of additional required qualifying trusts and accounts;

b. drafting, dissemination, and execution of plan documents;

c. hiring of third-party administrators to perform contribution and benefit formula calculations, discrimination testing, and other actuarial tests; and

d. preparation and filing of plan reports and annual tax returns, such as IRS Form 5500, for tax compliance qualifications.

64. The HPI Enterprise Defendants failed to disclose that the deferred compensation strategies were merely a ruse to convince the plaintiffs to purchase PENN HPI policies, and that the plans and trusts they had promised to create were defective and/or incomplete, and could not generate or provide the promised tax savings.

**E.** **The HPI Enterprise Defendants' Scheme to Defraud Plaintiffs**

65. HPI policies are intended for high-net-worth individuals, partly due to the high cost of their premiums. Insurance agents are highly motivated to sell HPI policies because they generate extremely large commissions, in this case between 75% and 125% of the initial annual premium paid by the insured.

66. As described below, the HPI Enterprise Defendants devised and executed a scheme to defraud plaintiffs through the sale of HPI policies and related products and services. The HPI Enterprise Defendants induced plaintiffs to purchase HPI policies through the Sham Tax Avoidance Strategies described above in Section IV.D, which promised large (but illusory) tax deductions that could be generated through the HPI policies.

67. While most of the plaintiffs were not high net worth individuals and should not have been sold HPI policies (and as such, certainly didn't qualify for any PFLI loans), none of the plaintiffs had tax optimization experience. The HPI Enterprise Defendants took advantage of plaintiffs' lack of sophistication and convinced them that such policies were affordable due to the tax deductions they would generate—in essence promising them that the HPI policies would pay for themselves.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

68.     The HPI Enterprise Defendants profited richly by reaping large commissions, fees, and interest associated with the sale of HPI policies and related products and services.

69.     Plaintiffs received none of the promised tax benefits, and lost significant sums through the premiums, interest, and fees they paid to the HPI Enterprise Defendants. Ultimately, plaintiffs typically lost the HPI policies themselves (into which they had contributed significant funds) when they could no longer afford to pay the premiums.

### 1.     Fraudulent Conduct of Defendant BOLL

70.     Defendant BOLL, individually and in connection with the other HPI Enterprise Defendants, devised a scheme to sell PENN HPI policies to plaintiffs, despite knowing that they lacked the financial resources to continue paying high premiums over time. He persuaded plaintiffs to buy the PENN HPI policies by promoting sham tax avoidance strategies that incorporated PENN HPI policies. They falsely told plaintiffs that the resulting tax savings (which were in truth illusory) would make the HPI policies both affordable and lucrative for them.

71.     BOLL presented himself as a religious and well-meaning cancer survivor, who was also an impressively credentialed business, insurance, and tax expert. He held seminars promoting his sham tax avoidance strategies, which were attended by LEWIS, and some of the plaintiffs as well.

72.     In order to carry out this scheme, defendant BOLL enlisted various entities and individuals to promote the sale of PENN HPI policies and carry out the associated sham tax avoidance strategies. These included defendants PENN, WINTRUST, LEWIS, CROSSLIN, KALICKI, OSHINS, PLURIS, and ROBAK, among others. This scheme enabled the HPI Enterprise Defendants to reap huge profits from commissions generated by the sale of HPI policies, as well as profits associated with the sale of services and products associated with the sham tax avoidance strategies.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

73.    At all times, the HPI Enterprise Defendants knew that the sham tax avoidance strategies were unlawful and could not legitimately generate the promised tax savings.

74.    Defendants BOLL and CROSSLIN also relied on the sham tax avoidance strategies to promote and sell to most plaintiffs so-called "Stewardship Agreements," at a cost of $3,000 per month, under which plaintiffs would cede control of their finances to BOLL and/or CROSSLIN (an entity controlled by BOLL). For this fee, BOLL and CROSSLIN would provide advice and service relating to the sham tax avoidance strategies, which they knew were unlawful.

75.    Most of the Stewardship Agreements and sham tax avoidance strategies were implemented through limited liability companies created by BOLL or by defendant law firms KALICKI and OSHINS at the direction of defendant BOLL. A public records search revealed approximately 725 BOLL-related LLCs, the vast majority of which were entities created in Wyoming whose official place of business is a luxury home in that state associated with BOLL.

### 2.    Fraudulent Conduct of Defendant CROSSLIN

76.    Defendants BOLL and CROSSLIN created and maintained the sham tax avoidance strategies used in the fraudulent scheme.

77.    At the direction of defendant BOLL, most plaintiffs entered into "Stewardship Agreements" with defendant CROSSLIN (or one of its predecessors) whereby plaintiffs would pay CROSSLIN fees of $3,000 per month in exchange for its services relating to the sham tax avoidance strategies.

78.    Through Stewardship Agreements and/or other representation, one critical service provided by defendant CROSSLIN was the preparation of tax returns for each of the plaintiffs and often their companies and affiliates, as well as tax returns for the sham LLCs that had been created at defendant BOLL's direction in connection with the sham tax avoidance strategies.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

79.     At all times, defendants BOLL and CROSSLIN knew that the sham entities for which CROSSLIN prepared returns did not meet IRS standards for the particular tax deductions that were being claimed. BOLL and CROSSLIN nevertheless assured plaintiffs that the tax deductions were legitimate, and plaintiffs filed their tax returns on this basis (though for some plaintiffs, CROSSLIN also failed to timely file tax returns, causing other problems).

80.     As a result of the fraudulent scheme's improper tax treatments, many of the plaintiffs were required to re-file their taxes, and some were (or are being) audited.

81.     On information and belief, CROSSLIN never publicly or formally terminated BOLL, and never officially advised their clients (including plaintiffs) of what had happened.

### 3.    Fraudulent Conduct of Defendants PENN and LEWIS

82.     At all relevant times, defendant BOLL was a commission-based career agent of defendant PENN. A career agent is generally a full-time, commissioned salesperson who works for an insurance company's field office and is obligated to send most of their business to that company.

83.     Defendant PENN, however, never disclosed to plaintiffs that defendant BOLL was a career commission-based agent of PENN. PENN instead held out BOLL as a "financial professional" and qualified independent tax expert who could be trusted to act on their behalf.

84.     Defendant BOLL worked directly with defendant LEWIS, who was an employee of defendant PENN and the Managing Partner of its Nashville, Tennessee office. PENN describes LEWIS as having "nearly four decades" of relevant experience and describes his role and employment position as follows: "Since 2016, [LEWIS] has been a managing partner and principal with Penn Mutual, and for the past eight years, he has been instrumental in leading [PENN's Nashville office]."[5]

---

[5] 1847 Financial is a trade name of PENN. Website accessed 12/15/24, at https://1847financial.com/blog/spotlight-on-dewane-lewis/

85.     Defendant LEWIS condoned and co-promoted the sham tax avoidance strategies prior to (and after) the plaintiffs entering into them.

86.     In fact, Defendant LEWIS attended a "Tax Strategy Workshop" put on by BOLL in Nashville, TN in June of 2021, and was quoted on promotional materials as follows (with full attribution to his capacity as Managing Partner for PENN)[6]: **"The most comprehensive tax workshop I have ever attended in my 33 year career — practical implementable strategies everyone can use."**

87.     Defendant LEWIS is also quoted in promotional materials regarding BOLL's "Tax Game 101: Keeping More of What's Yours" as saying: **"We recommend all of our agents get this course in the hands of every client."** These promotional materials identified and touted LEWIS as a Managing Partner for PENN.

88.     Each plaintiff relied on defendant PENN's endorsement of defendant BOLL as a "tax expert" in deciding to participate in his sham tax avoidance strategies, purchase a HPI policy from PENN, and/or purchase a PFLI loan from defendant WINTRUST. Without PENN's endorsement of BOLL, plaintiffs would not have chosen to work with him.

89.     BOLL worked with LEWIS to market, sell, underwrite, and issue the PENN HPI policies. BOLL and LEWIS also worked together to further the various sham tax avoidance strategies promoted to the victim plaintiffs by ensuring that the PENN HPI policies reflected the names of the indirect businesses that owned the PENN HPI policies.

90.     BOLL and LEWIS also similarly worked together to market, sell, document and administer the PFLI loans with WINTRUST (further discussed in the next section, regarding WINTRUST).

91.     On numerous occasions, defendant LEWIS was present when defendant BOLL made false representations to the victim plaintiffs regarding the purported tax benefits associated with his sham tax avoidance strategies. LEWIS knew that these

---

[6] See *supra,* at footnote 1: PS&G Financial Partners is a trade name of PENN.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

representations were false when BOLL made them, as he was aware that the deductions were improper, and that using them as a means to sell the PENN HPI policies was similarly improper.

92. Plaintiffs repeatedly informed LEWIS they were acquiring the PENN HPI policies and PFLI loans based on BOLL's assurances they would receive tax deductions, and LEWIS failed to warn or instruct plaintiffs the deductions were illusory and/or illegal.

93. Under applicable state insurance law, defendant PENN, independently and through LEWIS, had a duty not to accept business that PENN knew was unlawfully solicited.

94. After defendant BOLL's federal felony conviction in 2022, PENN and LEWIS began a comprehensive effort to scrub BOLL from their records, and substituted another agent (D.K.) as the "writing agent." This was a false statement, because the writing agent is by definition the original agent who solicited, sold, completed, and signed the original application, and who typically delivered the policy—which for the victim plaintiffs was BOLL. D.K. was never the "writing agent" but instead the "servicing agent" who took over handling the policies that BOLL had originated.

95. PENN sought to sanitize its records to conceal BOLL's indictment from plaintiffs (and likely from any regulatory scrutiny), and never informed plaintiffs that BOLL was no longer authorized to represent PENN and that another person had been appointed as their writing agent instead.

### 4. Fraudulent Conduct of Defendant WINTRUST

96. At all relevant times, defendants BOLL and LEWIS acted as agents and unlicensed loan brokers on behalf of, and at the direction of, defendant WINTRUST.

97. WINTRUST conducted its PFLI loan business through BOLL, CROSSLIN, PENN, and LEWIS, who identified individuals willing to purchase WINTRUST PFLI loans, touted the supposed benefits of such loans, and falsely described the tax benefits of such loans. The actions of BOLL and LEWIS fell within the scope of this agency for

WINTRUST, and their actions are therefore imputed to WINTRUST under the doctrine of *respondeat superior.*

98.    Defendant WINTRUST also delegated to defendants BOLL, CROSSLIN, LEWIS, and PENN the authority to act on behalf WINTRUST with regard to the plaintiffs who bought PFLI loans from WINTRUST, including the authority to provide required lending disclosures to such plaintiffs; to obtain properly documented and executed PFLI loan applications; and to service and administer the PFLI loans once they were in place.

99.    In connection with PENN and LEWIS, defendant WINTRUST, directly and acting through its agent defendant BOLL, promoted PFLI loans to certain plaintiffs to induce them to purchase PENN HPI policies associated with the sham tax avoidance strategies. At all times, WINTRUST, through its agent BOLL, knew that these sham tax avoidance strategies were illicit and could not legitimately generate the claimed tax savings.

100.    Defendant WINTRUST, acting through its agent defendant BOLL, knowingly used false valuations of plaintiffs' net worth prepared by defendants BOLL and CROSSLIN in order to "comply" with its underwriting requirements for PFLI loans.

101.    As defendants knew, without receiving dramatically reduced income tax bills (as a result of the fraudulent tax schemes sold by defendants), coupled with the temporary low interest rates that existed during 2019 through 2022, the schemes were not otherwise appropriate, affordable, or attractive for any plaintiff.

102.    To induce them to participate, BOLL, CROSSLIN, LEWIS, and PENN falsely told the plaintiffs that the PENN HPI policy's cash value would earn a rate higher than the PFLI loan charges.

103.    BOLL, CROSSLIN, WINTRUST, and PENN concealed the potential known cost of credit and resulting lack of financial viability from plaintiffs. They also concealed WINTRUST's potential collateral requirements, and how WINTRUST could value the requisite collateral.

104.   Moreover, PFLI policies are required to meet PENN's specific PFLI underwriting guidelines, and WINTRUST has its own similar required underwriting guidelines for PFLI loans. No PFLI policy or loan should issue unless those PENN and/or WINTRUST underwriting guidelines are followed.

105.   PENN's own marketing materials state that the primary purpose for a PFLI policy is both a need and a desire for the insurance. Moreover, PFLI policies require a purchase to have a minimum net worth of $7,500,000, and WINTRUST's materials require a minimum of $5,000,000. This is because the policy premiums are more than $100,000 each year, and if interest rates don't stay within a narrow band, the policies don't accrue a cash value fast enough to stay ahead of PFLI loan and collateral requirements, which trigger collateral calls and loan defaults.

106.   PFLI loans are never appropriate when the policy owner's income or assets make payment of the premiums, absent of financing, unaffordable. Certain high net worth individuals can afford to take these risks, but none of the plaintiffs were in that position.

107.   But notwithstanding the failure of the plaintiffs to meet the required underwriting guidelines, both PENN and WINTRUST issued the PFLI policies and loans anyway.

**5.    Fraudulent Conduct of Defendant Law Firms KALICKI and OSHINS**

108.   The sham tax avoidance strategies devised by defendants required the creation of certain entities that would purchase and hold the PENN HPI insurance policies.

109.   In order to create these entities, defendants BOLL and CROSSLIN created business LLCs and directed clients to defendant law firms KALICKI and OSHINS, which would in turn establish the required entities, such as Charitable LLCs ("CLLCs"), Beneficiary Defective Inheritance Trusts ("BDITs"), and "Investment LLCs" (entities used as tax avoidance vehicles) that would either "manage" the investment of assets

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

borrowed from the CLLCs, or else otherwise defer or avoid taxes in keeping with the overall HPI Enterprise.

110. In addition to establishing these entities, defendants KALICKI and/or OSHINS would prepare various documentation needed to carry out the sham tax avoidance strategies. These documents included the operating agreements for the LLCs, as well as notes and security agreements when funds were "loaned" by a BDIT or CLLC to an affiliated Investment LLC. Defendants KALICKI and OSHINS also assisted with pledging the necessary collateral to secure the loans made to these Investment LLCs.

111. Further, BOLL, CROSSLIN, and KALICKI utilized sham charities (that were not qualified charities) and "recommended" them to clients for use in the sham Charitable Life Insurance Strategy. KALICKI's engagement letter specifically states that they will provide "*Assistance with selecting the charity,*" yet they typically used charities BOLL created and/or selected, and which, on information and belief, were not approved IRS charitable entities.

112. For its part of the scheme, KALICKI would create and implement the following:

a.   The victim plaintiff purportedly contributes significant cash or assets to a charitable limited liability company (hereafter, a "CLLC," and the strategy itself, "CLLC Strategy").

b.   In almost all instances, 99% ownership of the CLLC is then assigned to an entity that is tax-exempt under § 501(c)(3) of the Internal Revenue Code (the "Charity").

c.   Once the "transfer" of the 99% interest to the Charity is made, BOLL, on behalf of the victim, immediately "borrows" all of the funds from the CLLC, thereby retaining control.

d.   The Charity signs a document acknowledging it is 99% owner of a CLLC.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

e.    Each Charity typically also receives an actual $5,000 donation from the victim, but typically never receives anything more than this initial $5,000.

f.    At the time of the gift to the Charity, an "Asset Agreement" is entered into by the CLLC and the Charity, in which the Charity agrees that upon request by the manager of the CLLC, the Charity will transfer its 99% membership interest to another 501(c)(3)-qualified charity (the "Transferee Charity"), provided that the original Charity has received two years of distributions (the annual distribution amount, according to the overall plan, is an amount equal to the value of the CLLC multiplied by the applicable federal rate). This requirement to retransfer the CLLC interests is referred to as the "Transfer Obligation." Thus, at the outset, the illusory nature of the Charity's interest in the CLLC is expressly described in the documentation.

113.    As part of the CLLC scheme, KALICKI also worked with PLURIS (through ROBAK) to procure appraisals of certain "donated" interests, to provide a veneer of legitimacy to this scheme.

114.    At all times, defendants KALICKI and OSHINS knew that the entities they created were being used by BOLL in furtherance of a sham tax avoidance strategy in connection with BOLL's fraudulent scheme to sell PENN HPI policies to plaintiffs.

**6.    Fraudulent Conduct of defendants PLURIS and ROBAK**

115.    Defendant PLURIS, controlled by defendant ROBAK, was hired by defendant KALICKI as an "independent qualified appraiser" in furtherance of the sham tax avoidance strategies.

116.    For a legitimate tax deduction to be taken in connection with loans made by the CLLCs created for defendant BOLL's sham tax avoidance strategies, the IRS requires an independent appraisal of the value of the CLLC interest as well as the value of the donated interest.

117.   PLURIS (through ROBAK) knowingly created fraudulent asset appraisals for the CLLC membership interests, in order to seek tax deductions. At all times, PLURIS and ROBAK knew that the PLURIS appraisals did not reflect the actual value of the donated interest—which was essentially zero because the taxpayer retained control and benefits equal to the entire value of the transaction. In such circumstances, IRS rules do not permit the donated interest to be deducted.

118.   At all times, defendant PLURIS and ROBAK knew that the valuations they created for the CLLC interests were false, because they knew that the taxpayer retained control and benefits equal to the entire value of the transaction.

119.   At all times, defendant PLURIS and ROBAK knew that the false valuations they created were being used in furtherance of a sham tax avoidance strategy in connection with BOLL's fraudulent scheme to sell PENN HPI policies to plaintiffs.

120.   As a result of these known defects, none of the promised tax and other benefits were legitimately possible or likely to be achieved. This led to unnecessary costs expended by plaintiffs to create these meaningless reports and entities, as well as foreseeable and significant losses stemming from audits, penalties and interest, as well as the requirement to file amended tax returns.

121.   The transactions were shams, and any purported need for HPI in connection with the sham was fraudulently induced by defendants.

**F.    The Captive Insurance Scheme**

122.   In addition to the RICO wire fraud conspiracy described above, defendants BOLL, CROSSLIN, OXFORD and SRA engaged in a separate fraudulent scheme that involved captive insurance programs.

123.   Typically, legitimate captive insurance is where a company sets up its own insurance tool, risk retention group or policy in which risk sharing and risk shifting among other insureds are present.

124.   Since at least 2014, BOLL and CROSSLIN has marketed captive insurance as a way to have a virtually unlimited tax-deductible piggy bank.

125.    Rather than sell captive insurance to businesses with a need to reduce insurance costs, BOLL and CROSSLIN used captives to manufacture additional insurance charges for secondary insurance policies with extraordinarily high premiums for illusory coverage.

126.    BOLL and CROSSLIN involved OXFORD and SRA to issue these disguised policies after having performed ineffective due diligence. The premiums for the coverages that were charged bear no actual relationship to reality for the risks plaintiffs who participated in these schemes faced with their businesses.

127.    Rather than sell captive insurance to businesses with a need to reduce insurance costs, or insure otherwise uninsurable risks, BOLL and CROSSLIN used captives to manufacture disguised personal tax advantage savings plans in the form of additional insurance charges for secondary insurance policies with extraordinarily high premiums for illusory coverage.

128.    BOLL and CROSSLIN enlisted OXFORD and SRA to design, co-market and issue these policies after having performed sham feasibility studies and no due diligence. The premiums for the coverages that were charged bore no relation to the actual business risks faced by the plaintiffs who participated in these schemes.

129.    Rather, BOLL and CROSSLIN falsely told to the plaintiffs (orally and in writing) that they would receive a report of tax benefits and costs, that the net premium would be invested and earn a safe and competitive interest rate, and that they could then simply unwind or dissolve the captive arrangement and pay substantially less tax even after considering any fees charged by OXFORD or SRA.

130.    As detailed below in Section V, as a direct result of defendant BOLL and CROSSLIN's false statements, approximately half of the plaintiffs paid BOLL and CROSSLIN to establish captive insurance plans, which caused them to lose hundreds of thousands of dollars.

131.    In short, the captive insurance arrangements were yet another way to defraud plaintiffs. They generated unconscionably high fees for defendants BOLL, CROSSLIN,

OXFORD and SRA, and generated supposed tax deductions in connection with insurance that bore no reasonable relationship to plaintiff's businesses or any valid insurable risk.

132.    OXFORD and SRA knowingly marketed their captive insurance policies as disguised improper supplemental retirement plans for business owners.

133.    BOLL and CROSSLIN were aware of and knowingly directly or indirectly benefited from BOLL and CROSSLIN's improper captive insurance scheme.

134.    Moreover, captive insurance may not be used to fund life insurance, let alone personal life insurance policies. The IRS has successfully attacked arrangements where premiums or assets of the captive insurance policy were used to pay for life insurance.

135.    BOLL and CROSSLIN knew captive insurance may not be used in connection with funding life insurance policies, nevertheless BOLL advised certain plaintiffs to use captive insurance policy reserves, of an OXFORD policy BOLL caused to be written, to be used as collateral for a WINTRUST PFLI loan and/or to pay PENN HPI policy premiums.

### G.    Acts of Fraud by Defendants

136.    The HPI Enterprise functioned by fraudulently selling, and profiting from, PENN HPI policies and related products. Pursuant to and in furtherance of this fraudulent scheme, the HPI Enterprise Defendants committed multiple related acts of wire fraud, in violation of 18 United States Code § 1343, as set forth below. This constituted a pattern of racketeering activity as defined by 18 United States Code § 1962(a).

137.    The additional acts of fraud committed by defendants BOLL, CROSSLIN, OXFORD and SRA in furtherance of the non-RICO captive insurance scheme are also set forth below.

138.    The circumstances constituting the fraud committed by defendants are stated with particularity below, pursuant to Fed. R. Civ. P. 9(b).

### 1. Fraudulent Statements to Plaintiffs KEVIN M. CHRISTIAN and/or LINDA D. CHRISTIAN

139.   On or about December 20, 2017, BOLL spoke with KEVIN M. CHRISTIAN and/or LINDA D. CHRISTIAN (the "CHRISTIANs") by telephone to discuss his sham tax avoidance strategies, which BOLL memorialized via an interstate wire communication (email) later that same day.

140.   BOLL's December 20, 2017 email was sent to both KEVIN M. CHRISTIAN and his business partner, plaintiff CHASE A. GIBSON. The email details that BOLL's and the defendants' business involvement with the CHRISTIANs and GIBSONs (as defined below) was centered around a purported tax mitigation strategy.

141.   That email presented four sham tax avoidance strategies riddled with omissions and misrepresentations about tax law that BOLL and the other defendants knew were misleading, illusory, and/or out of compliance with IRS tax code, included material false statements about specific tax deductions the CHRISTIANs and GIBSONs could receive through life insurance and premium finance schemes, which BOLL later structured with other defendants and sold to the CHRISTIANS and GIBSONs.

142.   Among the recommendations in the email were a sham deferred compensation strategy, coupled with sham ownership structures for HPI and PFLI arrangements, all of which were claimed to result in hundreds of thousands of dollars in tax savings.

143.   On July 12, 2018, via an interstate wire communication, BOLL sent the CHRISTIANs and the GIBSONs a powerpoint describing the sham tax avoidance strategies BOLL was promoting.

144.   On December 12, 2018, PENN issued policy number 27750440 on the life of Kevin M. Christian. The policy documents were delivered to the plaintiff via an interstate wire communication.

145.   On December 31, 2018, the CHRISTIANs and the GIBSONs, via an entity they jointly own, made two initial business checks to CB&S Bank at the direction of BOLL, being $14,100.00 and $76,300.00, totaling $90,400.00 for a combination of

COMPLAINT

origination fees, prepaid interest, and collateral for a PFLI loan based on fraudulent misrepresentations.

146.    On February 15, 2019, PENN issued policy number 27750420 on the life of LINDA D. CHRISTIAN. The policy documents were delivered to the plaintiff via an interstate wire communication.

147.    On or about March 5, 2019, the CHRISTIANs and GIBSONs executed a Promissory Note with CB&S Bank for $1,600,000.00, which included a Commercial Security Agreement between CB&S Bank and Dark Horse Contender, LLC (an entity BOLL and other defendants created for the CHRISTIANs and GIBSONs).

148.    The PFLI loan was secured by the PENN policies issued to the CHRISTIANs and the GIBSONs, and was further collateralized by a deposit account and/or CD dated March 5, 2019 in the name of the CHRISTIANs and the GIBSONs entity, Contender Energy Partners, LP at CB&S Bank.

149.    The loan and policy documents were delivered to the respective plaintiffs via an interstate wire communication. Pursuant to this plan established by BOLL and other defendants, payments via electronic bank wire and check were made from CHRISTIANs and GIBSONs from the state of Texas to entities in other states.

150.    BOLL, CROSSLIN, LEWIS, and PENN eventually arranged for the CHRISTIANs and GIBSONs to move their premium finance loan to WINTRUST, with CROSSLIN (through its predecessor, "TBH Tax, LLC") listed as the broker.

151.    BOLL, LEWIS, and PENN modeled the program to grow annually by $1,600,000.00, being $400,000.00 in new premium growth each year for each PENN policy.

152.    On or about February 25, 2020, via an interstate wire communication, the CHRISTIANs and GIBSONs received an Offer Sheet from WINTRUST wherein WINTRUST offered to loan them $3,275,000.00 for premium financing of the PENN polices.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

153.   On or about May 13, 2020, via an interstate wire communication, the CHRISTIANs and GIBSONs entered into a Master Promissory Note with WINTRUST establishing Loan Number 44-106448 for "Life Insurance Premium Financing for Dark Horse Contender, LLC," the same entity set up by defendants for the CHRISTIANS and GIBSONS as part of the defendants' sham tax scheme.

154.   As part of the scheme, the defendants instructed the CHRISTIANs and GIBSONs to liquidate the CD at CB&S and deposit $664,447.13 cash in a bank account at Lake Forest Bank & Trust Company, N.A., a bank affiliated with WINTRUST.

155.   On or about May 13, 2020, via an interstate wire communication, the CHRISTIANs entered into a Master Promissory Note with WINTRUST.

156.   On or about January 20, 2021, via an interstate wire communication, the CHRISTIANS and GIBSONs entered into a loan renewal with WINTRUST with outstanding principal of $5,226,088.88.

157.   On or about February 15, 2022, via an interstate wire communication, the CHRISTIANs and GIBSONs entered into a loan renewal with WINTRUST with outstanding principal of $6,825,310.23.

158.   On or about January 19, 2023, Mr. Christian informed LEWIS, via an interstate wire communication (email) that Wintrust was requiring $575,416.22 in prepaid interest to renew the premium finance loan for the CHRISTIANs and the GIBSONs. Interest rates had skyrocketed, the program was not financially viable, and their concerns were growing over whether BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and the other defendants had misled plaintiffs as to the legitimacy of the tax mitigation strategy.

159.   On or about February 23, 2023, WINTRUST issued a Notice of Default letter to the CHRISTIANS and GIBSONs, who did not have the liquidity to pay the prepaid interest requirement, demanding that default be remedied with fifteen (15) days or they would declare the entire outstanding principal balance, together with all accrued and unpaid interest, immediately due and payable, and interest would continue to accrue

COMPLAINT

at the Default Rate, and that WINTRUST would exercise and all remedies including surrender of the PENN policies.

160.  On or about March 1, 2023, KEVIN M. CHRISTIAN, via an interstate wire communication, emailed LEWIS informing him of concerns related to BOLL, the PENN policies, and premium finance program, informing LEWIS of the CHRISTIANs' and GIBSONs' belief that the program was improper, potentially unlawful, and misrepresented, and they requested a forbearance concerning premiums for at least sixty (60) days.

161.  LEWIS forwarded said email to WINTRUST the same day and the WINTRUST Assistant Loan Officer responded on March 2, 2023, saying they would "discuss with senior management on how we will be proceeding further."

162.  On March 7, 2023, the WINTRUST Assistant Loan Officer responded via email stating "Senior management has declined the request on the forbearance agreement," and informed KEVIN M. CHRISTIAN that the loan would lapse on April 16, 2023.

163.  On December 6, 2024, WINTRUST informed the CHRISTIANS, via an interstate wire communication (email) that, if they choose not to renew, the loan payoff amount would be $2,680,659,95 (increasing daily due to interest accruing), but the surrender value on the single remaining PENN policy is only $2,408,215.,36. That surrender value together with the remaining cash balance in the collateral account would still require the CHRISTIANs to pay $51,524.06 to WINTRUST to close down the loan and program.

164.  In total, the CHRISTIANS and the GIBSONS funded hundreds of thousands of dollars into sham tax avoidance strategies set up by BOLL, CROSSLIN, LEWIS, PENN, WI NTRUST, and other defendants based on the defendants' misrepresentations concerning tax mitigation strategies and the supposed financial viability of the various products and sham tax avoidance strategies recommended.

### 2. Fraudulent Statements to Plaintiffs CHASE A. GIBSON and/or FELICIA D. GIBSON

165. As discussed above, CHASE A. GIBSON and/or FELICIA D. GIBSON (the "GIBSONs") were defrauded alongside the CHRISTIANs, and the allegations therein are incorporated as though fully set forth here.

166. On February 15, 2019, PENN issued policy number 27750400 on the life of CHASE A. GIBSON. The policy documents were delivered to the plaintiff via an interstate wire communication.

167. On February 15, 2019, PENN issued policy number 27750380 on the life of FELICIA D. GIBSON. The policy documents were delivered to the plaintiff via an interstate wire communication.

168. Details concerning the GIBSONs' history, payments, and damages caused by the defendants mirrors in great respect the details of the CHRISTIANs' information, detailed above, since the GIBSONs and CHRISTIANs are business partners and participated as such in the fraudulent schemes. All the information in the section concerning the CHRISTIANs is incorporated here by this reference.

### 3. Fraudulent Statements to Plaintiffs NATHAN D. DETRACY and/or JENNIFER DETRACY

169. On or about March 14, 2016, BOLL met with NATHAN D. DETRACY and JENNIFER DETRACY (the "DETRACYs") in person to discuss BOLL's sham tax avoidance strategies, which included amending their prior years' tax returns to recover taxes paid, which BOLL claimed the plaintiffs were entitled to because their previous accountant had missed certain tax savings.

170. During this discussion, BOLL falsely told the DETRACYs that purchasing permanent life insurance through an IRC § 409(A) Welfare Benefit Plan would provide them with large income tax deductions. Additionally, Defendant BOLL discussed establishing the micro-captive insurance policy scheme as a tax deduction to the DETRACYs' business.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

171.   On or about April 11, 2016, via an interstate wire communication, the DETRACYs entered into a "Financial Consulting Client Agreement" with BOLL.

172.   Through the client agreement, BOLL convinced the DETRACYs that the various insurance policies and related products should be indirectly owned through businesses the DETRACYs retained a controlling interest in.

173.   The DETRACYs followed BOLL and CROSSLIN's fraudulent plan, wherein, relying on BOLL's sham tax avoidance strategies, they agreed to enter into a number of further agreements.

174.   On or about April 14, 2016, via an interstate wire communication, at BOLL's behest, the DETRACYs entered into an agreement with OSHINS for the drafting of a purported an Asset Protection Trust. The DETRACYs paid OSHINS at least $13,750.

175.   On or about December 14, 2016, via an interstate wire communication, at BOLL's behest, the DETRACYs entered into a Captive Services Agreement with Defendant OXFORD for implementation and operation of a captive insurance company. The DETRACYs paid OXFORD at least $6,250.

176.   On or about August 1, 2017, via an interstate wire communication, the DETRACYs entered into a Stewardship Agreement with BOLL's company "RevLove LLC." The DETRACYs paid financial consulting and/or Stewardship Agreement fees to BOLL and/or CROSSLIN (on information and belief, the successor to RevLove LLC) totaling at least $162,900.

177.   On July 12, 2019, PENN issued a life insurance policy on plaintiff Jennifer DeTracy for life insurance.

178.   PENN was paid premiums for life insurance policies by plaintiffs totaling at least $90,333.

179.   On or about February 9, 2022, via an interstate wire communication, the DETRACYs were sent the SRA Terms of 831b Plan Administration for implementation

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

and operation of an 831b private reinsurance company. The DETRACYs paid SRA at least $45,000.

180.   On or about April 16, 2016, via an interstate wire communication, the DETRACYs entered into an agreement with OSHINS for legal services for legal work in furtherance of BOLL's sham tax avoidance strategies. The DETRACYs paid OSHINS at least $7,250.

181.   BOLL also fraudulently induced the DETRACYs into giving him a loan, which he failed to repay.

### 4.    Fraudulent Statements to Plaintiffs JOHN PATRICK DWYER JR. and/or CHRISTINE DWYER

182.   On or about July 18, 2019, Defendant BOLL met in person with plaintiffs JOHN PATRICK DWYER JR. and CHRISTINE DWYER (the "DWYERs") to discuss BOLL's sham tax avoidance strategies.

183.   During this discussion, BOLL falsely told the DWYERs that interest on their PENN PFLI policies would provide them with large tax deductions.

184.   Shortly after that meeting, also on July 18, 2019, via an interstate wire communication, the DWYERs signed a stewardship agreement with BOLL and CROSSLIN through electronic signature. The DWYERs eventually paid at least $168,886.97 to BOLL and/or CROSSLIN pursuant to this agreement.

185.   Through the stewardship agreement, BOLL convinced the DWYERs that the various insurance policies and related products should be indirectly owned through businesses the DWYERs retained a controlling interest in.

186.   The DWYERs followed BOLL and CROSSLIN's fraudulent plan, wherein, relying on BOLL's sham tax avoidance strategies, they agreed to enter into a number of further agreements.

187.    On July 19, 2019, PENN emailed plaintiff JOHN PATRICK DWYER JR. a policy application for Versatile Choice Whole Life insurance.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

188.   In the Personal Finances section of the PENN policy application, the "Insured Net Worth" was listed by BOLL as $26,522,333, with the Fair Market Value of their business listed as $23,333,333.

189.   When the DWYERs raised concerns regarding the value of the business, and told BOLL they thought their actual net worth was approximately $5 million, BOLL told them that the valuation, as determined by BOLL, was appropriate, and that he knew how to properly value their business and net worth.

190.   On behalf of CROSSLIN, BOLL created a "comfort letter," wherein he justified the business valuation and net worth figures he included in the DWYERs' PENN policy application. On or about August 16, 2019, BOLL sent, via an interstate wire communication, that comfort letter to PENN, and provided a copy to the DWYERs.

191.   The DWYERs, via an interstate wire communication, were also convinced to obtain PFLI loans from WINTRUST in connection with the PENN HPI policies. The DWYERs paid WINTRUST at least $123,592.41 in fees, plus at least an additional $203,232.60 (in the form of collateral posted and lost to WINTRUST).

192.   In or about August of 2019, via an interstate wire communication, at BOLL's behest, the DWYERs entered into an agreement with Defendant OXFORD for implementation and operation of a captive insurance company. The DWYERs paid OXFORD at least $348,000.

193.   Absent the fraudulently exaggerated net worth statement by BOLL, the DWYERs would not have met the $7.5 million threshold to apply for a PENN PFLI.

194.   Believing BOLL and CROSSLIN, the DWYERs signed and returned the application materials via an interstate wire communication.

195.   On December 3, 2019, PENN issued policy 28006770 on John Dwyer for life insurance.

196.   On December 3, 2019, PENN issued policy 28005200 on Christine Dwyer for life insurance.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

197.   On or after September 17, 2019 and October 3, 2019, PENN issued additional life insurance policies on the lives of the DWYERs two children.

198.   PENN was paid premiums for HPI policies totaling at least $1,286,483.58.

199.   On or about April 14, 2020, via an interstate wire communication, the DWYERs entered into an agreement with OSHINS for legal services for legal work in furtherance of BOLL's sham tax avoidance strategies. The DWYERs paid OSHINS at least $13,500.

200.   This agreement was made in order to allow OSHINS to further BOLL's tax services.

201.   BOLL also fraudulently convinced the DWYERs to invest in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the DWYERs.

### 5.    Fraudulent Statements to Plaintiffs JOHN DAVID JEFFREY FOLSOM and/or MICAH DANNAN FOLSOM

202.    On or about December 29, 2019, BOLL spoke with plaintiffs JOHN DAVID JEFFREY FOLSOM and MICAH DANNAN FOLSOM (the "FOLSOMs") on the phone to discuss BOLL's sham tax avoidance strategies.

203.   During this discussion, BOLL falsely told the FOLSOMs that interest on PENN PFLI policies, and premiums on their other PENN HPI policies, would provide them with large tax deductions.

204.   Shortly after that phone call, on January 16, 2020, via an interstate wire communication, the FOLSOMs signed a stewardship agreement with BOLL and CROSSLIN through electronic signature. The FOLSOMs paid at least $98,964.26 pursuant to this agreement.

205.   Through the stewardship agreement, BOLL and CROSSLIN convinced the FOLSOMs that the various insurance policies and related products should be indirectly owned through businesses in which the FOLSOMs retained a controlling interest.

206.   The FOLSOMs followed BOLL and CROSSLIN's plan.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

207.    On or about March 4, 2020, the FOLSOMs were convinced to apply for life insurance on the lives of each of their 5 children, which they did via an interstate wire communication.

208.    On or about March 5, 2020, PENN, via an interstate wire communication, emailed the FOLSOMs applications for individual life insurance, which were completed and signed electronically by the Plaintiffs, and returned via an interstate wire communication.

209.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $30,481,533. When the FOLSOMs raised concerns regarding the net worth figure, and told BOLL they thought their actual net worth was approximately $2 million, BOLL told them that the valuation, as determined by BOLL, was appropriate.

210.    Absent the fraudulently exaggerated net worth statement by BOLL, the FOLSOMs would not have met the $7,500,000 threshold to apply for premium financed life insurance, based on PENN's policy at the time of application.

211.    On or about March 4, 2020, BOLL sent the FOLSOMs a WINTRUST Life Insurance Financing Credit Application.

212.    On this credit application, BOLL is listed as the Submitting Broker/Agent through his company name "Innovative Risk Alliance," and BOLL had already filled out the "Statement of Financial Condition" information section for the FOLSOMs.

213.    As with PENN application, BOLL listed the FOLSOM's Current Net Worth (from Financial Statement) as $30,481,533, including $27,231,533 from "Closely held Corporations."

214.    Both the PENN and WINTRUST exaggerated net worth statements were justified to the FOLSOMs by BOLL as defensible and appropriate.

215.    Absent the fraudulently exaggerated net worth statement by BOLL, the FOLSOMs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

216.   On or about July 24, 2020, plaintiffs entered into a Master Promissory Note with Wintrust Life Finance. The loan agreement was sent via interstate wire communication and signed electronically. The FOLSOMs paid WINTRUST at least $82,992.38 in fees, plus at least an additional $310,886.01 (in the form of collateral posted and lost to WINTRUST).

217.   On or about March 6, 2020, via an interstate wire communication, the FOLSOMs entered into a Captive Services Agreement with OXFORD for implementation and operation of a captive insurance company. OXFORD was paid, via an interstate wire communication, $15,000 for an initial risk evaluation report and engagement fee, as well as fees for continued administration of the micro-captive insurance company.

218.   Upon termination of the micro-captive insurance company on August 21, 2023, which was sent via an interstate wire communication, OXFORD was paid additional fees of at least $100,000.

219.   On December 1, 2020, PENN issued life insurance policies on the lives of John David Folsom, Micah Folsom, and each of their four children. PENN was paid premiums for these life insurance policies totaling at least $900,000.

220.    On or before December 7, 2021, the FOLSOMs entered into an agreement via an interstate wire communication with SRA for the creation and administration of an 831b private reinsurance company. SRA was paid at least $35,000 by the FOLSOMs.

221.   BOLL also fraudulently convinced the FOLSOMs to invest in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the FOLSOMs.

### 6.    Fraudulent Statements to Plaintiffs THOMAS BRADLEY FOSTER and/or ERICKA R. FOSTER

222.   On or about October 9, 2020, Defendant BOLL met with plaintiffs THOMAS BRADLEY FOSTER and/or ERICKA R. FOSTER (the "FOSTERs") to discuss BOLL's sham tax avoidance strategies.

223.   During this discussion, BOLL proposed a Charitable LLC tax scheme to the FOSTERs.

224.   Shortly after that phone call, on October 14, 2020, via interstate wire communication, the FOSTERs signed a stewardship agreement with BOLL and CROSSLIN through electronic signature. The FOSTERs paid at least $34,671.86 pursuant to this agreement.

225.   Through the stewardship agreement, BOLL convinced the FOSTERs that the various insurance policies and related products should be indirectly owned through businesses in which the FOSTERs retained a controlling interest.

226.   The FOSTERs followed BOLL's plan.

227.   On or about December 6, 2021, PENN, via interstate wire communication, sent the FOSTERs an Application for Life Insurance, which they signed and returned electronically, via interstate wire communication.

228.   On or about December 22, 2021, via an interstate wire communication, the FOSTERs entered into a Master Promissory Note with WINTRUST. The FOSTERs paid WINTRUST at least $12,719 in fees, plus at least an additional $154,461 (in the form of collateral posted and lost to WINTRUST).

229.   On August 10, 2021, PENN issued policy 2879726 on the life of Thomas Bradley Foster.

230.   On December 23, 2021, PENN issued policy 2879724 on the life of Ericka Foster.

231.   PENN was paid premiums for the FOSTERs' life insurance policies in excess of $544,000.

232.   Further, the deductions BOLL and CROSSLIN told the FOSTERs to take were disallowed by the IRS.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### 7. Fraudulent Statements to Plaintiffs JOEL B. FREEMAN and/or BREANNE ASHLEY FREEMAN

233.    On or about August 30, 2019, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs JOEL B. FREEMAN and/or BREANNE ASHLEY FREEMAN (the "FREEMANs") to discuss BOLL's sham tax avoidance strategies.

234.    During this discussion, BOLL falsely told the FREEMANs that interest on PENN PFLI policies would provide them with large tax deductions.

235.    Shortly after that phone call, also on August 30, 2019, via interstate wire communication, the FREEMANs signed a stewardship agreement with BOLL and CROSSLIN through electronic signature. The FREEMANs paid at least $101,346.66 pursuant to this agreement.

236.    Through the stewardship agreement, BOLL convinced the FREEMANs that the various insurance policies and related products should be indirectly owned through businesses in which the FREEMANs retained a controlling interest.

237.    The FREEMANs followed BOLL's plan.

238.    On or about May 5, 2020, via an interstate wire communication, PENN sent the FREEMANs a certified financial statement for Versatile Choice Whole Life insurance.

239.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $26,066,536. While the FREEMANs raised concerns regarding the value of the business, and told BOLL they thought their actual net worth was approximately $2,000,000, BOLL told them that the valuation, as determined by BOLL, was appropriate.

240.    After BOLL's reassurances, via an interstate wire communication, the FREEMANs electronically signed and returned the PENN application.

241.    Absent the fraudulently exaggerated net worth statement by BOLL, the FREEMANs would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

242.    On or about January 5, 2020, BOLL sent the FREEMANs a WINTRUST Life Insurance Financing Credit Application.

243.    On this credit application, BOLL had already filled out the "Statement of Financial Condition" information section for the FREEMANs.

244.    As with PENN application, BOLL listed the FREEMAN's Current Net Worth (from Financial Statement) was immensely exaggerated, but defendants justified the valuation to the FREEMANs.

245.    Absent the fraudulently exaggerated net worth statement by BOLL, the FREEMANs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

246.    On or about June 19, 2020, via an interstate wire communication, the FREEMANs entered into a Master Promissory Note with WINTRUST. The FREEMANs paid WINTRUST at least $63,150.69 in fees, plus at least an additional $153,368.33 (in the form of collateral posted and lost to WINTRUST).

247.    On July 2, 2020, PENN issued policy 28083290 on the life of Breanne Freeman.

248.    On July 14, 2020, PENN issued policy 28082740 on the life of Joel Freeman.

249.    PENN was paid premiums for the FREEMANs' life insurance policies in excess of $700,000.

250.    On or about April 20, 2020, via an interstate wire communication, at BOLL's urging, the FREEMANs hired OSHINS for the creation of certain trust and other materials that furthered BOLL's tax schemes. The FREEMANs paid OSHINS not less than $6,750.

251.    On or about March 31, 2020, via an interstate wire communication, at BOLL's behest, the FREEMANs entered into a Captive Services Agreement with Defendant OXFORD for implementation and operation of a captive insurance company. The FREEMANs paid OXFORD at least $13,500.

COMPLAINT

252.    On or about August 2, 2021, at BOLL's urging, the FREEMANs were sent, via interstate wire communication, the SRA Terms of 831B Plan Administration Agreement for the implementation and operation of the 831B Private Reinsurance Company. SRA was paid at least $35,000 by the FREEMANs.

253.    BOLL also fraudulently convinced the FREEMANs to invest in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the FREEMANs.

### 8.    Fraudulent Statements to Plaintiffs JAMES HICKS and/or LARA HICKS

254.    On or about March 12, 2018, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs JAMES HICKS and/or LARA HICKS (the "HICKS") to discuss BOLL's sham tax avoidance strategies.

255.    During this discussion, BOLL falsely told the HICKS that interest on PENN PFLI policies would provide them with large tax deductions.

256.    Shortly after that phone call, also on August 3, 2018, via interstate wire communication, the HICKS signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "Apokaradokia") through electronic signature. The HICKS paid at least $55,670.01 pursuant to this agreement.

257.    Through the stewardship agreement, BOLL convinced the HICKS that the various insurance policies and related products should be indirectly owned through businesses in which the HICKS retained a controlling interest.

258.    The HICKS followed BOLL's plan.

259.    On or about October 1, 2018, PENN sent the HICKS, via interstate wire communication, a Confidential Financial Statement. which was already completed by BOLL.

260.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $17,710,000, including business equity of $15,200,000. While the HICKS raised concerns regarding the value of the business, and told BOLL it

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

should be closer to $1,400,000, BOLL told them that the valuation, as determined by BOLL, was appropriate.

261.    Absent the fraudulently exaggerated net worth statement provided by BOLL, the HICKS would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

262.    On November 21, 2018, PENN issued policy 27761180 on the life of James Hicks, and policy 27761150 on the life of Lara Hicks.

263.    On or about April 24, 2019, PENN issued additional life insurance policies on the HICKS' children.

264.    PENN was paid premiums for the HICKS' PENN HPI policies totaling at least $2,000,000.

265.    On or about November 10, 2020, BOLL sent the HICKS a WINTRUST Life Insurance Financing Credit Application, via interstate wire communication (by text).

266.    On this credit application, BOLL had already filled out the "Statement of Financial Condition" information section for the HICKS.

267.    As with PENN application, BOLL listed the HICKS' Current Net Worth (from Financial Statement) as immensely exaggerated.

268.    Both the PENN and WINTRUST exaggerated net worth statements were justified to the HICKS by BOLL as defensible and appropriate.

269.    Absent the fraudulently exaggerated net worth statement by BOLL, the HICKS would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

270.    On or about December 22, 2020, the HICKS entered into a Master Promissory Note with WINTRUST. The loan agreement was sent via an interstate wire communication and signed electronically by the HICKS. The HICKS paid WINTRUST at least $259,184.82 in fees, plus at least an additional $209,000 (in the form of collateral posted and lost to WINTRUST).

271.   On or about November of 2022, via several interstate wire communications, the HICKS were encouraged by BOLL and LEWIS to take out a "hard money" loan, at 10% interest, to pay the PENN HPI policy premium in order to not lose the policy.

272.   At BOLL and LEWIS' urging, the HICKS obtained a $150,000 loan and used $95,000 of it to pay down the PENN HPI policy premium.

273.   BOLL then fraudulently convinced HICKS to invest the balance into a gold futures group led by BOLL's colleague. That money was also lost.

### 9.    Fraudulent Statements to Plaintiffs STEPHEN ROGER INNIS and/or JAIME ROSE INNIS

274.    On or about January 13, 2020, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs STEPHEN ROGER INNIS and/or JAIME ROSE INNIS (the "INNIS") to discuss BOLL's sham tax avoidance strategies.

275.   During this discussion, BOLL falsely told the INNIS that interest on PENN PFLI policies would provide them with large tax deductions.

276.   Shortly after that phone call, on January 17, 2020, via interstate wire communication, the INNIS signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "TBH Tax") through electronic signature. The INNIS paid at least $108,019.60 pursuant to this agreement.

277.   Through the stewardship agreement, BOLL convinced the INNIS that the various insurance policies and related products should be indirectly owned through businesses in which the INNIS retained a controlling interest.

278.   The INNIS followed BOLL's plan.

279.   On or about June 4, 2020, via an interstate wire communication, PENN sent the INNIS an Application for Individual Life Insurance.

280.   In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as an even $10,000,000. While the INNIS raised concerns regarding the value of the business, and told BOLL they thought it was approximately

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

$2,000,000, BOLL told them that the valuation, as determined by BOLL, was appropriate.

281. Absent the fraudulently exaggerated net worth statement by BOLL, the INNIS would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

282. Relying on BOLL, the INNIS' signed the PENN HPI application on June 15, 2020.

283. On June 15, 2020, PENN issued policy 28294040 on STEPHEN ROGER INNIS' life.

284. On September 28, 2020, PENN issued policy 28343560 on JAIME ROSE INNIS' life.

285. On or about October 7, 2020, via an interstate wire communication, BOLL emailed the signature page of the WINTRUST Credit Application to the INNIS for their signature. No other portion of the document was provided to the INNIS.

286. On or about December 15, 2020, the INNIS' entered into a Master Promissory Note with WINTRUST. The loan agreement was signed via an interstate wire communication (electronically through email). The INNIS paid WINTRUST at least $111,327.63 in fees, plus at least an additional $269,537.66 (in the form of collateral posted and lost to WINTRUST).

287. On or about May 24, 2021, PENN issued additional life insurance policies on the INNIS' child.

288. PENN was paid premiums for the INNIS' life insurance policies totaling at least $1,310,463.54.

289. On or about April 10, 2020, via an interstate wire communication, at BOLL's behest, the INNIS' entered into a Captive Services Agreement with OXFORD for implementation and operation of a captive insurance company. The INNIS' paid OXFORD at least $10,000.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

290.   BOLL also fraudulently convinced the INNIS' to invest approximately $83,000 in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the INNIS.

### 10.   Fraudulent Statements to Plaintiffs JOSH NATHANAEL JOHNSON and/or SEASON MARIE JOHNSON

291.   IIn or about February of 2019, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs JOSH NATHANAEL JOHNSON and/or SEASON MARIE JOHNSON (the "JOHNSONs") to discuss BOLL's sham tax avoidance strategies.

292.   During this discussion, BOLL falsely told the JOHNSONs that interest on PENN PFLI policies would provide them with large tax deductions, among his discussion of other sham tax schemes.

293.   A few days later, on March 3, 2019, via interstate wire communication, the JOHNSONs signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "Apokaradokia") through electronic signature.

294.   On September 9, 2019, via interstate wire communication, the JOHNSONs signed another stewardship agreement with BOLL and CROSSLIN (through its predecessor "TBH Tax") through electronic signature. The JOHNSONs paid at least $100,000 pursuant to this (and the prior) agreement.

295.   Through the stewardship agreement, BOLL convinced the JOHNSONs that the various insurance policies and related products should be indirectly owned through businesses in which the JOHNSONs retained a controlling interest.

296.   The JOHNSONs followed BOLL's plan.

297.   On or about March 29, 2019, via interstate wire communication, PENN emailed the JOHNSONs an Application for Life Insurance.

298.   In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $11,650,000. While the JOHNSONs raised concerns

regarding the value of the business, and told BOLL they thought this number was far too high, BOLL told them that the valuation, as determined by BOLL, was appropriate.

299.  Absent the fraudulently exaggerated net worth statement by BOLL, the JOHNSONs would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

300.  Relying on BOLL, the JOHNSONs signed the PENN HPI application.

301.  On or about November 13, 2019, BOLL sent the JOHNSONs a WINTRUST Life Insurance Financing Credit Application, via interstate wire communication (by text).

302.  On this credit application, BOLL had already filled out the "Statement of Financial Condition" information section for the JOHNSONs.

303.  As with PENN application, BOLL listed the JOHNSONs Current Net Worth (from Financial Statement) as an immensely exaggerated $12 million.

304.  As with the PENN exaggerated net worth statement, the WINTRUST exaggerated net worth statements was justified to the JOHNSONs by BOLL as defensible and appropriate.

305.  Absent the fraudulently exaggerated net worth statement by BOLL, the JOHNSONs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

306.  On February 28, 2020, PENN issued policy 2790978 on JOSH NATHANAEL JOHNSON's life.

307.  On February 29, 2020, Defendant PENN issued policy 27909780 on SEASON MARIE JOHNSON's life.

308.  PENN was paid premiums for its HPI policies totaling at least $300,000.

309.  On or about April 16, 2020, the JOHNSONs entered into a Master Promissory Note with WINTRUST. The loan agreement was signed via an interstate wire communication (electronically through email). The JOHNSONs paid WINTRUST at least $29,854.97 in fees, plus at least an additional $19,554 (in the form of collateral posted and lost to WINTRUST).

310.    BOLL also fraudulently convinced the JOHNSONs to invest approximately $40,000 in several of his other businesses and/or business opportunities, but on information and belief, these were not legitimate investments, and BOLL (or his associates) simply took the money, and never accounted for it to the JOHNSONs.

**11.    Fraudulent Statements to Plaintiffs KARL MCALLISTER and/or MELISSA MCALLISTER**

311.    On or about July 2, 2019, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs KARL MCALLISTER and/or MELISSA MCALLISTER (the "MCALLISTERs") to discuss BOLL's sham tax avoidance strategies.

312.    During this discussion, BOLL falsely told the MCALLISTERs that interest on PENN PFLI policies would provide them with large tax deductions.

313.    Shortly after that phone call, on July 3, 2019, via interstate wire communication, the MCALLISTERs signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "TBH Tax") through electronic signature. The MCALLISTERs paid at least $72,472.65 pursuant to this agreement.

314.    Through the stewardship agreement, BOLL convinced the MCALLISTERs that the various insurance policies and related products should be indirectly owned through businesses in which the MCALLISTERs retained a controlling interest.

315.    The MCALLISTERs followed BOLL's plan.

316.    On or about June 7, 2021, via interstate wire communication, PENN emailed the MCALLISTERs an Application for Life Insurance.

317.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $12,000,000. While the MCALLISTERs raised concerns regarding the value of the business, and told BOLL they thought this number was far too high, BOLL told them that the valuation, as determined by BOLL, was appropriate.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

318.   Absent the fraudulently exaggerated net worth statement by BOLL, the MCALLISTERs would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

319.   Relying on BOLL, the MCALLISTERs signed the PENN HPI application.

320.   On or about June 6, 2021, BOLL sent the MCALLISTERs a WINTRUST Life Insurance Financing Credit Application, via interstate wire communication (by text).

321.   On this credit application, BOLL had already filled out the "Statement of Financial Condition" information section for the MCALLISTERs.

322.   As with PENN application, BOLL listed the MCALLISTERs Current Net Worth (from Financial Statement) as an immensely exaggerated to approximately $36 million.

323.   As with the PENN exaggerated net worth statement, the WINTRUST exaggerated net worth statements was justified to the MCALLISTERs by BOLL as defensible and appropriate.

324.   Absent the fraudulently exaggerated net worth statement by BOLL, the MCALLISTERs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

325.   On June 25, 2021, PENN issued policy 2865041 on KARL MCALLISTER's life.

326.   On July 7, 2021, PENN issued policy 2842806 on MELISSA MCALLISTER's life.

327.   PENN was paid premiums for its HPI policies totaling at least $150,000.12.

328.   On or about October 16, 2020, the MCALLISTERs entered into a Master Promissory Note with WINTRUST. The loan agreement was signed via an interstate wire communication (electronically through email). When the PFLI policies became unaffordable, the MCALLISTERs lost all of the fees paid to WINTRUST, as well as the collateral they posted to WINTRUST.

329.   On or about March 27, 2020, via an interstate wire communication, at BOLL's behest, the MCALLISTERs entered into a Captive Services Agreement with OXFORD for implementation and operation of a captive insurance company. The MCALLISTERs paid OXFORD at least $10,000.

330.   On or about April 20, 2020, via an interstate wire communication, at BOLL's urging, the MCALLISTERs hired OSHINS for the creation of certain trust and other materials that furthered BOLL's tax schemes. The MCALLISTERs paid OSHINS not less than $30,500.

331.   BOLL also defrauded the MCALLISTERs out of their Dallas, TX home.

332.   In a deal structured by BOLL that involved using several of his other businesses to make and receive payments, on March 9, 2020, BOLL "purchased" the MCALLISTERs' home on the fraudulent promise that payments would be made for it.

333.   However, BOLL's "purchase" left the MCALLISTERs with an eventual shortfall of approximately $250,000, due to his failure to perform on the purchase and the expenses that failure caused to the MCALLISTERs.

334.   In 2020, and continuing through 2022, BOLL also fraudulently convinced the MCALLISTERs to invest at least $850,000 in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the MCALLISTERs.

### 12.   Fraudulent Statements to Plaintiffs NATHAN WESLEY MOORE and/or DANA JOANNE MOORE

335.   On or about November of 2018, via an interstate wire communication, Defendant BOLL spoke over the telephone with plaintiffs NATHAN WESLEY MOORE and/or DANA JOANNE MOORE (the "MOOREs") to discuss BOLL's sham tax avoidance strategies.

336.   During this discussion, BOLL falsely told the MOOREs that interest on PENN PFLI policies would provide them with large tax deductions.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

337.    Shortly after that phone call, on December 1, 2018, via interstate wire communication, the MOOREs signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "Apokaradokia") through electronic signature. The MOOREs paid at least $23,400 pursuant to this agreement.

338.    Through the stewardship agreement, BOLL convinced the MOOREs that the various insurance policies and related products should be indirectly owned through businesses in which the MOOREs retained a controlling interest.

339.    The MOOREs followed BOLL's plan.

340.    On or about March 6, 2019, via interstate wire communication, PENN emailed the MOOREs an Application for Life Insurance.

341.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $17.5 million. While the MOOREs raised concerns regarding the value of the business, and told BOLL they thought this number was far too high, BOLL told them that the valuation, as determined by BOLL, was appropriate.

342.    Relying on BOLL, the MOOREs signed the PENN HPI application.

343.    On September 6, 2019, PENN issued policy 2788985 on DANA JOANNE MOORE's life.

344.    On September 18, 2019, PENN issued policy 2788984 on NATHAN WESLEY MOORE's life.

345.    The MOOREs paid the PENN premiums for these HPI policies through their business "in accordance with Randy [BOLL]'s strategy" and totaling at least $196,000.

### 13.    Fraudulent Statements to Plaintiffs ERIC PARDUE and/or KRISTEN M. PARDUE

346.    On or about January 22, 2019, BOLL met in person with plaintiffs ERIC PARDUE and/or KRISTEN M. PARDUE (the "PARDUEs") to discuss BOLL's sham tax avoidance strategies.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

347. During this discussion, BOLL falsely told the PARDUEs that interest on PENN PFLI policies would provide them with large tax deductions, including the entire $300,000 in HPI policy premiums.

348. Shortly after that meeting, on January 28, 2019, via interstate wire communication, the PARDUEs signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "Apokaradokia") through electronic signature. The PARDUEs paid at least $138,426.00 pursuant to this agreement.

349. Through the stewardship agreement, BOLL convinced the PARDUEs that the various insurance policies and related products should be indirectly owned through businesses in which the PARDUEs retained a controlling interest.

350. The PARDUEs followed BOLL's plan.

351. On or about March 11, 2019, via interstate wire communication, PENN emailed the PARDUEs an Application for Life Insurance.

352. In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $31,750,000. While the PARDUEs raised concerns regarding the value of the business, and told BOLL they thought this number was far too high, and should be closer to $1.5 million, BOLL told them that the valuation, as determined by BOLL, was appropriate.

353. Absent the fraudulently exaggerated net worth statement by BOLL, the PARDUEs would not have met the $7,500,000 threshold to apply for a PENN PFLI policy, based on PENN's policy at the time of application.

354. Relying on BOLL, the PARDUEs signed the PENN HPI application.

355. On December 11, 2019, PENN issued policy 2789384 on ERIC PARDUE's life.

356. On April 19, 2020, PENN issued policy 2790168 on KRISTEN M. PARDUE's life.

357. PENN was paid premiums for its HPI policies totaling at least $900,000.

358.   On or about December 5, 2019, via interstate wire communication, BOLL sent the WINTRUST Credit Application to the PARDUEs.

359.   On this credit application, Defendant BOLL is listed as the Submitting Broker/Agent through his Company Name INNOVATIVE RISK ALLIANCE.

360.   Most of the pertinent financial fields on the WINTRUST credit application were not filled in, with the exception Schedule 4 – Investments in Partnerships, which BOLL had completed. In that section, the Current Market Value of the PARDUEs' partnership, solely owned by the PARDUEs as a spousal unit, was listed as $28,000,000.

361.   As with the PENN exaggerated net worth statement, the WINTRUST exaggerated valuation in the application was justified to the PARDUEs by BOLL as defensible and appropriate.

362.   Absent the fraudulently exaggerated valuation by BOLL, the PARDUEs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

363.   On or about May 14, 2020, the PARDUEs entered into a Master Promissory Note with WINTRUST. The loan agreement was signed via an interstate wire communication (electronically through email). The PARDUEs paid WINTRUST at least $37,324.00 in fees, plus at least an additional $85,068.00 (in the form of collateral posted and lost to WINTRUST).

364.   On or about December 30, 2021, BOLL convinced the PARDUEs to invest in a crypto mining opportunity he was promoting. BOLL promised that, if the PARDUEs invested $20,000, they'd receive $25,000 over the course of 10 quarters (2.5 years) – a 25% return. Based on BOLL's representations, on December 30, 2021, the PARDUEs invested, via an interstate wire communication, but only received a total of $7,923, for a loss of $12,077.

### 14.   Fraudulent Statements to Plaintiff LISA M. PRICE

365.   In or about early August of 2019, BOLL met in person with plaintiff LISA M. PRICE ("PRICE") to discuss BOLL's sham tax avoidance strategies.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

366.    During this discussion, BOLL falsely told PRICE that interest on PENN PFLI policies would provide them with large tax deductions.

367.    Shortly after that meeting, on August 21, 2019, via interstate wire communication, PRICE signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "TBH Tax") through electronic signature. PRICE paid at least $89,710.99 pursuant to this agreement.

368.    BOLL convinced PRICE that the various insurance policies and related products should be indirectly owned through businesses in which PRICE retained a controlling interest, utilizing his sham charitable life insurance strategy.

369.    PRICE followed BOLL's plan.

370.    On February 10, 2020, via interstate wire communication, BOLL texted PRICE and a PENN employee to discuss life insurance.

371.    On or about September 28, 2020, PRICE was told by BOLL, via interstate wire communication, that the PENN/WINTRUST PFLI policy was "required" notwithstanding that PRICE had sufficient assets to collateralize the CLLC without a PENN/WINTRUST PFLI policy.

372.    On or about September 29, 2020, PRICE was contacted, via interstate wire communication, by a PENN employee in order to discuss her life "insurance file."

373.    On or about October 6, 2020, via interstate wire communication, PENN emailed PRICE an Application for Individual Life Insurance.

374.    On January 28, 2021, PENN issued policy 2839280 on PRICE's life.

375.    PENN was paid premiums for this HPI policy totaling $1,215,477.44.

376.    On or about October 4, 2020, via interstate wire communication, PRICE signed a credit application with WINTRUST.

377.    On or about January 21, 2021, via interstate wire communication, PRICE entered into a Master Promissory Note with WINTRUST. PRICE paid WINTRUST at least $56,380.44 in fees, plus at least an additional $361,765.44 (in the form of collateral posted and lost to WINTRUST).

378.   On or about October 11, 2020, via interstate wire communication, PRICE entered into an agreement with KALICKI for legal services in order to further BOLL's tax schemes. PRICE paid KALICKI at least $50,000.

379.   In the scope of the CLLC strategy, BOLL convinced PRICE to realize more than $800k in unrealized capital gains in her portfolio in order to maximize the size of the charitable deduction. The larger the deduction, the larger the PFLI policy he could convince her to buy.

380.   PRICE is under IRS audit for 2020 and 2021 related to the CLLC and other improper deductions, and has incurred legal and accounting charges related thereto in excess of $130,000 to-date. Her accountants estimate penalties and interest of about $570,000, excluding taxes owed on non-deductible expenses improperly taken.

### 15.   Fraudulent Statements to Plaintiffs JOSHUA L. SPENCER and/or MELINDA M. SPENCER

381.   On or about February 7, 2020, BOLL met in person with plaintiffs JOSHUA L. SPENCER and/or MELINDA M. SPENCER (the "SPENCERs") to discuss BOLL's sham tax avoidance strategies.

382.   During this discussion, BOLL falsely told the SPENCERs that interest on PENN PFLI policies would provide them with large tax deductions.

383.   Shortly after that meeting, on February 10, 2020, via interstate wire communication, the SPENCERs signed a stewardship agreement with BOLL and CROSSLIN (through its predecessor "TBH Tax") through electronic signature. The SPENCERs paid at least $77,537.60 pursuant to this agreement.

384.   Through the stewardship agreement, BOLL convinced the SPENCERs that the various insurance policies and related products should be indirectly owned through businesses in which the SPENCERs retained a controlling interest.

385.   The SPENCERs followed BOLL's plan.

386.    The SPENCERs were also provided, via interstate wire communication, with a personalized "Entity Engineering" powerpoint prepared by BOLL and CROSSLIN (through its predecessor, "TBH Tax").

387.    On or about July 2, 2020, via interstate wire communication, PENN emailed the SPENCERs an Application for Life Insurance.

388.    In the Personal Finances section of the policy application, the Insured Net Worth was listed by BOLL as $3,000,000. While the SPENCERs raised concerns regarding the value of the business, and told BOLL they thought this number was far too high, BOLL told them that the valuation, as determined by BOLL, was appropriate.

389.    Relying on BOLL, the SPENCERs signed the PENN HPI application.

390.    On August 5, 2020, PENN issued policy 2831076 on JOSHUA L. SPENCER's life.

391.    PENN was paid premiums for its HPI policies totaling at least $119,485.35.

392.    On or about October 7, 2020, via interstate wire communication, BOLL sent the WINTRUST Credit Application to the SPENCERs.

393.    On this credit application, Defendant BOLL is listed as the Submitting Broker/Agent through his Company Name INNOVATIVE RISK ALLIANCE.

394.    In the Insured Information section of this credit application, the SPENCERs' Current Net Worth (from Financial Statement) was listed by BOLL as $26,900,000, including $21M as "Closely held Corporations."

395.    Notwithstanding the dramatically lower value included in the PENN application, the WINTRUST exaggerated valuation in the application was justified to the SPENCERs by BOLL as defensible and appropriate.

396.    Even though the SPENCERs ultimately decided against financing the premiums on their PENN HPI policies, absent the exaggerated valuation by BOLL, the SPENCERs would not have met the threshold to apply for premium financed life insurance, based on WINTRUST's policy at the time of application.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

397.    On or about April 17, 2020, via an interstate wire communication, at BOLL's urging, the SPENCERs hired OSHINS for the creation of certain trust and other materials that furthered BOLL's tax schemes. The SPENCERs paid OSHINS not less than $5,000.

398.    On BOLL and CROSSLIN's urging, the SPENCERs deducted $50,000 in PENN HPI policy premiums.

399.    BOLL also fraudulently convinced the SPENCERs to invest in several of his other businesses, but on information and belief, BOLL simply took the money, and never accounted for it to the SPENCERs.

## V.    CLAIMS FOR RELIEF

### CLAIM 1
### Violations of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. § 1962(c)]
### (Against Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, KALICKI, PLURIS, ROBAK, and OSHINS)

400.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

401.    The HPI Enterprise is an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise.

402.    Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, KALICKI, PLURIS, ROBAK, and OSHINS ("HPI Enterprise Defendants") agreed to and did conduct and participate in the conduct of the HPI Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding plaintiffs.

403.    Pursuant to and in furtherance of their fraudulent scheme, the HPI Enterprise Defendants committed multiple related acts of wire fraud, in violation of 18 U.S.C. § 1343.

404.    The acts of wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

405.   The HPI Enterprise Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

406.   As a direct and proximate result of the HPI Enterprise Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), plaintiffs have been injured in their business and property in an amount to be proven at trial, but presently estimated to be in excess of $20 million.

**CLAIM 2**
**Violations of the Racketeer Influenced and**
**Corrupt Organizations Act [18 U.S.C. § 1962(d)]**
**(Against Defendants BOLL, CROSSLIN, LEWIS, PENN,**
**WINTRUST, KALICKI, PLURIS, ROBAK, and OSHINS)**

407.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

408.   As set forth above, the HPI Enterprise Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), which prohibits persons from conducting and participating in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

409.   The HPI Enterprise Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The HPI Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

410.   As a direct and proximate result of the HPI Enterprise Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), plaintiffs have been injured in their business and property in an amount to be proven at trial, but presently estimated to be in excess of $20 million.

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## CLAIM 3
### Breach of the Covenant of Good Faith and Fair Dealing
**Plaintiffs KEVIN M. CHRISTIAN, LINDA D. CHRISTIAN, CHASE A. GIBSON,
and FELICIA D. GIBSON
(Against CROSSLIN, PENN, and WINTRUST)**

411.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

412.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

413.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST each breached the implied covenant of good faith and fair dealing as to each Plaintiff.

414.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

415.   As explained above, CROSSLIN, PENN, and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

416.   Plaintiffs were damaged by CROSSLIN, PENN, and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

## CLAIM 4
### Negligent Misrepresentation
**Plaintiffs KEVIN M. CHRISTIAN, LINDA D. CHRISTIAN, CHASE A. GIBSON,
and FELICIA D. GIBSON
(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

417.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

418.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

419.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

420.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 5**
**Fraud**
**Plaintiffs KEVIN M. CHRISTIAN, LINDA D. CHRISTIAN, CHASE A. GIBSON, and FELICIA D. GIBSON**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

421.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

422.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each defrauded Plaintiffs.

423.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

424.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 6**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs NATHAN D. DETRACY and JENNIFER DETRACY**
**(Against CROSSLIN, PENN, OSHINS, and OXFORD)**

425.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

426.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

427.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, OSHINS, and OXFORD breached the implied covenant of good faith and fair dealing as to each Plaintiff.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

428.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

429.   As explained above, PENN and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

345.   Plaintiffs were damaged by PENN and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

## CLAIM 7
### Negligent Misrepresentation
### Plaintiffs NATHAN D. DETRACY and JENNIFER DETRACY
### (Against BOLL, CROSSLIN, LEWIS, PENN, OSHINS, and OXFORD)

430.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

431.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and OSHINS, and OXFORD (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

432.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

433.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

## CLAIM 8
### Fraud
### Plaintiffs NATHAN D. DETRACY and JENNIFER DETRACY
### (Against BOLL, CROSSLIN, LEWIS, PENN, OSHINS, and OXFORD)

434.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

435.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, OSHINS, and OXFORD (directly or through their agents) each defrauded Plaintiffs.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

436.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

437.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

### CLAIM 9
**Breach of the Covenant of Good Faith and Fair Dealing**
**JOHN PATRICK DWYER JR. and CHRISTINE DWYER**
**(Against CROSSLIN, PENN, WINTRUST, and OSHINS)**

438.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

439.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

440.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST, and OSHINS breached the implied covenant of good faith and fair dealing as to each Plaintiff.

441.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

442.   As explained above, CROSSLIN, PENN, WINTRUST, and OSHINS (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

443.   Plaintiffs were damaged by CROSSLIN, PENN, WINTRUST, and/or OSHINS' breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

### CLAIM 10
**Negligent Misrepresentation**
**JOHN PATRICK DWYER JR. and CHRISTINE DWYER**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OSHINS)**

444.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

445.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OSHINS (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

446.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

447.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 11**
**Fraud**
**JOHN PATRICK DWYER JR. and CHRISTINE DWYER**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OSHINS)**

448.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

449.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OSHINS (directly or through their agents) each defrauded Plaintiffs.

450.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

451.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 12**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs JOHN DAVID JEFFREY FOLSOM and MICAH DANNAN FOLSOM**
**(Against CROSSLIN, PENN, WINTRUST, OXFORD, and SRA)**

452.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

453.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

454.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN,

WINTRUST, OXFORD, and SRA breached the implied covenant of good faith and fair dealing as to each Plaintiff.

455.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

456.    As explained above, CROSSLIN, PENN, WINTRUST, OXFORD, and SRA (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

457.    Plaintiffs were damaged by CROSSLIN, PENN, WINTRUST, OXFORD, and SRA's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

## CLAIM 13
### Negligent Misrepresentation
**Plaintiffs JOHN DAVID JEFFREY FOLSOM and MICAH DANNAN FOLSOM
(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OXFORD, and SRA)**

458.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

459.    As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OXFORD, and SRA (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

460.    Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

461.    The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

## CLAIM 14
### Fraud
**Plaintiffs JOHN DAVID JEFFREY FOLSOM and MICAH DANNAN FOLSOM
(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OXFORD, and SRA)**

462.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

463.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OXFORD, and SRA (directly or through their agents) each defrauded Plaintiffs.

464.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

465.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 15**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs THOMAS BRAD FOSTER and ERICKA R. FOSTER**
**(Against CROSSLIN, PENN, and WINTRUST)**

466.   507.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

467.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

468.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, and/or WINTRUST breached the implied covenant of good faith and fair dealing as to each Plaintiff.

469.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

470.   As explained above, CROSSLIN, PENN, and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

471.   Plaintiffs were damaged by CROSSLIN, PENN, and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## CLAIM 16
### Negligent Misrepresentation
### Plaintiffs THOMAS BRAD FOSTER and ERICKA R. FOSTER
### (Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)

472.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

473.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

474.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

475.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

## CLAIM 17
### Fraud
### Plaintiffs THOMAS BRAD FOSTER and ERICKA R. FOSTER
### (Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)

476.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

477.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each defrauded Plaintiffs.

478.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

479.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

## CLAIM 18
### Breach of the Covenant of Good Faith and Fair Dealing
### Plaintiffs JOEL B. FREEMAN and BREANNE ASHLEY FREEMAN
### (Against CROSSLIN, PENN, WINTRUST, OSHINS, OXFORD, and SRA)

480.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

481.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

482.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST, OSHINS, OXFORD, and/or SRA breached the implied covenant of good faith and fair dealing as to each Plaintiff.

483.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

484.   As explained above, CROSSLIN, PENN, WINTRUST, OSHINS, OXFORD, and/or SRA (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

485.   Plaintiffs were damaged by CROSSLIN, PENN, WINTRUST, OSHINS, OXFORD, and/or SRA's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 19**
**Negligent Misrepresentation**
**Plaintiffs JOEL B. FREEMAN and BREANNE ASHLEY FREEMAN**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, OXFORD, and SRA)**

486.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

487.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, OXFORD, and SRA (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

488.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

489.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

## CLAIM 20
### Fraud
### Plaintiffs JOEL B. FREEMAN and BREANNE ASHLEY FREEMAN
### (Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, OXFORD, and SRA)

490.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

491.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, OXFORD, and SRA (directly or through their agents) each defrauded Plaintiffs.

492.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

493.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

## CLAIM 21
### Breach of the Covenant of Good Faith and Fair Dealing
### Plaintiffs JAMES HICKS and LARA HICKS
### (Against CROSSLIN, PENN, WINTRUST)

494.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

495.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

496.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, and/or WINTRUST breached the implied covenant of good faith and fair dealing as to each Plaintiff.

497.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

498.   As explained above, CROSSLIN, PENN, and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

COMPLAINT

345. Plaintiffs were damaged by CROSSLIN, PENN, and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 22**
**Negligent Misrepresentation**
**Plaintiffs JAMES HICKS and LARA HICKS**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

499.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

500.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

501.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

502.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 23**
**Fraud**
**Plaintiffs JAMES HICKS and LARA HICKS**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

503.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

504.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each defrauded Plaintiffs.

505.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

506.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

## CLAIM 24
### Breach of the Covenant of Good Faith and Fair Dealing
### Plaintiffs STEPHEN ROGER INNIS and JAIME ROSE INNIS
### (Against CROSSLIN, PENN, WINTRUST, and OXFORD)

507.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

508.    For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and Defendant.

509.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST, and/or OXFORD breached the implied covenant of good faith and fair dealing as to each Plaintiff.

510.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

511.    As explained above, CROSSLIN, PENN, WINTRUST, and/or OXFORD (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

512.    Plaintiffs were damaged by CROSSLIN, PENN, WINTRUST, and/or OXFORD's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

## CLAIM 25
### Negligent Misrepresentation
### Plaintiffs STEPHEN ROGER INNIS and JAIME ROSE INNIS
### (Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OXFORD)

513.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

514.    As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OXFORD (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

515.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

516.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

### CLAIM 26
### Fraud
**Plaintiffs STEPHEN ROGER INNIS and JAIME ROSE INNIS**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

517.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

518.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and OXFORD (directly or through their agents) each defrauded Plaintiffs.

519.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

520.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

### CLAIM 27
### Breach of the Covenant of Good Faith and Fair Dealing
**Plaintiffs JOSH NATHANAEL JOHNSON and SEASON MARIE JOHNSON**
**(Against CROSSLIN, PENN, and WINTRUST)**

521.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

522.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

523.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, and/or WINTRUST breached the implied covenant of good faith and fair dealing as to each Plaintiff.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

524.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

525.    As explained above, CROSSLIN, PENN, and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

526.    Plaintiffs were damaged by CROSSLIN, PENN, and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 28**
**Negligent Misrepresentation**
**Plaintiffs JOSH NATHANAEL JOHNSON and SEASON MARIE JOHNSON**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

527.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

528.    As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

529.    Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

530.    The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 29**
**Fraud**
**Plaintiffs JOSH NATHANAEL JOHNSON and SEASON MARIE JOHNSON**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)**

531.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

532.    As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each defrauded Plaintiffs.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

533.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

534.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 30**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs KARL MCALLISTER and MELISSA MCALLISTER**
**(Against CROSSLIN, PENN, WINTRUST, OSHINS, and OXFORD)**

535.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

536.   For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

537.   However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST, OSHINS, and/or OXFORD breached the implied covenant of good faith and fair dealing as to each Plaintiff.

538.   A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

539.   As explained above, CROSSLIN, PENN, WINTRUST, OSHINS, and/or OXFORD (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

540.   Plaintiffs were damaged by CROSSLIN, PENN, WINTRUST, OSHINS, and/or OXFORD's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 31**
**Negligent Misrepresentation**
**Plaintiffs KARL MCALLISTER and MELISSA MCALLISTER**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, and OXFORD)**

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

541.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

542.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, and OXFORD (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

543.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

544.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 32**
**Fraud**
**Plaintiffs JOSH NATHANAEL JOHNSON and SEASON MARIE JOHNSON**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, and OXFORD)**

545.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

546.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, OSHINS, and OXFORD (directly or through their agents) each defrauded Plaintiffs.

547.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations. Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 33**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs NATHAN WESLEY MOORE and DANA JOANNE MOORE**
**(Against CROSSLIN and PENN)**

548.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

549.    For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

550.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN and/or PENN breached the implied covenant of good faith and fair dealing as to each Plaintiff.

551.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

552.    As explained above, CROSSLIN and/or PENN (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

553.    Plaintiffs were damaged by CROSSLIN and/or PENN's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 34**
**Negligent Misrepresentation**
**Plaintiffs NATHAN WESLEY MOORE and DANA JOANNE MOORE**
**(Against BOLL, CROSSLIN, LEWIS, and PENN)**

554.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

555.    As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, and PENN (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

556.    Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

557.    The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**CLAIM 35**
**Fraud**
**Plaintiffs NATHAN WESLEY MOORE and DANA JOANNE MOORE**
**(Against BOLL, CROSSLIN, LEWIS, and PENN)**

558.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

559.    As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, and PENN (directly or through their agents) each defrauded Plaintiffs.

560.    As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

561.    Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

**CLAIM 36**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs ERIC PARDUE and KRISTEN M. PARDUE**
**(Against CROSSLIN, PENN, and WINTRUST)**

562.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

563.    For the reasons set forth above, Plaintiffs do not believe that any enforceable contracts exist as between any Plaintiff and any Defendant.

564.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, and/or WINTRUST breached the implied covenant of good faith and fair dealing as to each Plaintiff.

565.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

566.    As explained above, CROSSLIN, PENN, and/or WINTRUST (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

567.   Plaintiffs were damaged by CROSSLIN, PENN, and/or WINTRUST's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

## CLAIM 37
### Negligent Misrepresentation
### Plaintiffs ERIC PARDUE and KRISTEN M. PARDUE
### (Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)

568.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

569.   As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

570.   Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

571.   The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

## CLAIM 38
### Fraud
### Plaintiffs ERIC PARDUE and KRISTEN M. PARDUE
### (Against BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST)

572.   The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

573.   As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and WINTRUST (directly or through their agents) each defrauded Plaintiffs.

574.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

575.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

COMPLAINT

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**CLAIM 39**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiff LISA M. PRICE**
**(Against CROSSLIN, PENN, WINTRUST, and KALICKI)**

576.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

577.    For the reasons set forth above, plaintiff does not believe that any enforceable contracts exist as between plaintiff and any defendant.

578.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, WINTRUST, and/or KALICKI breached the implied covenant of good faith and fair dealing as to plaintiff.

579.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

580.    As explained above, CROSSLIN, PENN, WINTRUST, and/or KALICKI (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

581.    Plaintiff was damaged by CROSSLIN, PENN, WINTRUST, and/or KALICKI's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 40**
**Negligent Misrepresentation**
**Plaintiff LISA M. PRICE**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and KALICKI)**

582.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

583.    As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and KALICKI (directly or through their agents) each made a representation to plaintiff that certain material facts were true.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

584.    Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that plaintiff rely on the representations.

585.    Plaintiff did rely on these representations, which were a substantial factor in causing plaintiff's harm, which amount of such harm will be proven at trial.

**CLAIM 41**
**Fraud**
**Plaintiff LISA M. PRICE**
**(Against BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and KALICKI)**

586.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

587.    As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, WINTRUST, and KALICKI (directly or through their agents) each defrauded plaintiff.

588.    As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that plaintiff rely on the misrepresentations.

589.    Plaintiff reasonably relied thereon, and was damaged as a result, in an amount to be proven at trial.

**CLAIM 42**
**Breach of the Covenant of Good Faith and Fair Dealing**
**Plaintiffs JOSHUA L. SPENCER and MELINDA M. SPENCER**
**(Against CROSSLIN, PENN, and OSHINS)**

590.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

591.    For the reasons set forth above, plaintiffs do not believe that any enforceable contracts exist as between any plaintiff and any defendant.

592.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), CROSSLIN, PENN, and/or OSHINS breached the implied covenant of good faith and fair dealing as to each Plaintiff.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

593.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

594.    As explained above, CROSSLIN, PENN, and/or OSHINS (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

595.    Plaintiffs were damaged by CROSSLIN, PENN, and/or OSHINS's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

**CLAIM 43**
**Negligent Misrepresentation**
**Plaintiffs JOSHUA L. SPENCER and MELINDA M. SPENCER**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and OSHINS)**

596.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

597.    As alleged hereinabove, Defendants BOLL, CROSSLIN, LEWIS, PENN, and OSHINS (directly or through their agents) each made a representation to plaintiffs that certain material facts were true.

598.    Even if they believed these representations were true, they knew or should have known they were untrue, and the defendants intended that the plaintiffs rely on the representations.

599.    The plaintiffs did rely on these representations, which were a substantial factor in causing plaintiffs' harm, which amount of such harm will be proven at trial.

**CLAIM 44**
**Fraud**
**Plaintiffs JOSHUA L. SPENCER and MELINDA M. SPENCER**
**(Against BOLL, CROSSLIN, LEWIS, PENN, and OSHINS)**

600.    The allegations of the foregoing paragraphs are incorporated by reference as if set forth fully herein.

601.    As alleged hereinabove, defendants BOLL, CROSSLIN, LEWIS, PENN, and OSHINS (directly or through their agents) each defrauded Plaintiffs.

602.   As alleged hereinabove, each defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such defendant of their falsity, and with the intention that each plaintiff rely on the misrepresentations.

603.   Each plaintiff reasonably relied thereon, and each was damaged as a result, in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

604.   WHEREFORE, Plaintiffs request that this Court enter judgment against the defendants as follows:

a.    For actual damages in excess of $13,500,000, according to proof;

b.    For consequential damages in excess of $10,000,000, according to proof;

c.    For punitive damages;

d.    For treble damages, pursuant to 18 United States Code, Section 1964(c);

e.    For attorneys' fees and costs of suit, pursuant to 18 United States Code, Section 1964(c);

f.    For pre-judgment interest; and

g.    For such other and further relief as the court may deem just and proper.

Dated: December 16, 2024         HOLMES, ATHEY, COWAN & MERMELSTEIN LLP

Andrew B. Holmes
*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated: December 16, 2024         HOLMES, ATHEY, COWAN & MERMELSTEIN LLP

Andrew B. Holmes
*Attorneys for Plaintiffs*

# Exhibit A



**Folsom, JD & Micah**

TBH Tax Nashville Seminar, June 29-30, 2021

Asset Protection:

_____ Beneficiary Defective Inheritor Trust (BDIT)

_____ Holding Company (within BDIT)

Tax Strategy:

_____ Management Company

     _____ Section 105 (Health & Wellness Reimbursement Plan)

     _____ Dependent Payroll

_____ Section 179 Vehicle

_____ Compensation Study

_____ Entities Registered in Wyoming

_____ Charitable Partnership

Real Estate:

_____ Real Estate (Rental Properties)

_____ Land Trust

_____ Restricted Property Trust

_____ Cost Segregation Study

Insurance/Retirement Planning:

_____ Property & Casualty Insurance

_____ Whole Life Insurance

_____ Captive Insurance

_____ Cash Balance Plan (401(k))

Signed 2848 Power of Attorney:

_____ Yes



# ENTITY ENGINEERING

Folsom Family



# BENEFICIARY DEFECTIVE INHERITOR TRUST - BDIT
**Entity Engineering**















# CHARITABLE PARTNERSHIP
### Entity Engineering



## STEP 1

The Folsom family transfers assets to the Folsom Charitable Limited Liability Limited Partnership (LLLP)

**THE FOLSOM FAMILY**  $$$ →  **FOLSOM CHARITABLE LLLP**

---



**FOLSOM CHARITABLE LLLP**

## STEP 2

Folsom Charitable LLLP is structured with a General Partner (1% GP) and a Limited Partner (99% LP)

*Contributions*          *Irrevocable Gifts*

1% GENERAL PARTNER (GP)          99% Limited Partner (LP)

**FOLSOM INVESTMENT GP**          **CHARITY**

*GP maintains:*
1. *Voting Rights*
2. *Investment Control*

*LP maintains right to receive income.*
*[No voting rights or investment control]*
1. *Right to receive income*

- Charity gets money each year

# CHARITABLE PARTNERSHIP CONTINUED
**Entity Engineering**










**STEP 5**

## FOLSOM CHARITABLE LLLP

**TRUST PROTECTION**
Oversees Trustee

TRUSTEE PAYS INTEREST ANNUALLY ON PROMISSORY NOTE

## FOLSOM BDIT TRUST

*Trustee: Administrator's Trust*

*Promissory Note @ AFR (~1%) Interest for 30 Years*

**STEP 6**

BDIT purchases life Insurance policy to protect the liquidity of the Beneficiary during their life and after passing on.

## FOLSOM BDIT TRUST*

BUYS LIFE INSURANCE POLICY ON BENEFICIARY OF TRUST

## LIFE INSURANCE

*Trustee is responsible for administration of trust instrument. Many use sub-trustee for specific investment such as stocks.

**STEP 7**

## LIFE INSURANCE

LIFE INSURANCE POLICY IS FINANCED BY BANK

## BANK

*Bank pays the premium on the life insurance policy BDIT pays interest to the bank*

# CHARITABLE PARTNERSHIP CONTINUED
**Entity Engineering**



**STEP 3**

**CHARITY**

- The 99% LP interest creates a charitable deduction for the taxpayer equal to the value of the assets.
- Less a discount for:
(1) lack of marketability
(2) lack of control (Typically around 10%)

### EXAMPLE

| | |
|---|---|
| Value of Asset | $100,000,000 |
| Discount Valuation | 10% |
| Charitable Deduction | $90,000,000 |



**TRUST PROTECTION**

**STEP 4**

**FOLSOM CHARITABLE LLLP**

*GP invests assets of charitable LLLP*

*Promissory Note @ AFR (~1%) Interest for 30 Years*

*Has to happen each year*

**LOAN ASSETS ($100,000,000)**

*Oversees Trustee*

**FOLSOM BDIT TRUST**

*Trustee: Administrator's Trust*

*Estate tax free transfer for 360 years*

**FOLSOM FAMILY & BENEFICIARIES**



# CHARITABLE PARTNERSHIP CONTINUED
**Entity Engineering**



**STEP 8** — Life Insurance creates liquidity for client upon passing on or at the maturity of the Promissory Note

**STEP 9** — Charitable LLLP receives annual interest income from BDIT. Interest is paid out according to ownership percentages or as determined by the manager of the Charitable LLLP

**LIFE INSURANCE**

*Promissory Note @ AFR (~1%) Interest for 30 Years*

*Hypothetically the BDIT invests assets at 8% and pays annual interest of 1% to FOLSOM Charitable LLLP*

**FOLSOM CHARITABLE LLLP**

*7% annual arbitrage is created*

**FOLSOM CHARITABLE LLLP**

1% OF ANNUAL INTEREST INCOME AS 1% OWNER OF GP INTEREST

99% OF ANNUAL INTEREST INCOME AS 99% OWNER OF LP INTEREST

**FOLSOM INVESTMENT GP**

**CHARITY**



# EXPENSES
### Entity Engineering



| BDIT | Limited Liability Limited Partnership | Limited Partner | General Partner | Management Company | Holding Company | Personal Account | Land Trust Account** | Children Accounts |
|---|---|---|---|---|---|---|---|---|
| LLLP (99%) | General Partner (1%) | Business Travel | Owns Vehicle(s) | Children's Payroll | Life Insurance | Groceries* | Mortgage | Clothing |
| Limited Partner | Limited Partner (99%) | Business Meals & Entertainment | Gas & Vehicle Maintenance (If vehicle purchased by GP) | Health Related Reimbursements (Section 105) | Investments | Child Related* (If Not Using Children's Accounts) | Utilities | School Tuition & Supplies |
| Holding Co. | Income | Your Company Products & Expenses | | Support Animal Reimbursements (Section 105) | | Travel* | Property Tax | College Savings |
| Land Trust Beneficiary | Guaranteed Payments to Members | Business Charitable Contributions (i.e., Tithe, Donations, Charities, etc.) | | | | Clothing* | Repairs | |
| Brokerage Accounts | | | | | | Meals & Entertainment* | Landscaping | |
| Investments | | | | | | Student Loans | Homeowners Insurance | |
| Partnership Interests | | | | | | Furniture* | | |
| | | | | | | Gifts* | | |
| | | | | | | Health Related Expenses (Reimbursed by Mgmt. Co.) | | |
| | | | | | | Gas & Vehicle Maintenance (if vehicle not purchased by GP) | | |
| | | | | | | Personal Charitable Contributions (i.e., Tithe, Donations, Charities, etc.) | | *Must not be business related. **If no Land Trust, pay with LP. |

# ADDITIONAL ENTITIES
Entity Engineering



**Ranching**

**Family Company**
**Partnership**
**Folsom Cattle LLC**
**Purpose: Cattle Ranching**

**Family Company**
**Partnership**
**Henry's Fork Cattle Co LLC**
**Purpose: Cattle Ranching**

**Family Company**
**Partnership**
**Folsom Cattle Management Services LLC**
**Purpose: Cattle Ranching**

*Family Company*
*Hairpin Cattle*

**Veterinarian Services**

**Veterinarian Company**
**Partnership**
**Cattle Health and Reproduction LLC**
**Purpose: Veterinary Services and Products**

**Veterinarian Company**
**Partnership**
**CHR Livestock Supply LLC**
**Purpose Veterinary products and Feed**

**Charity**

**Charitable Partnership**
**Partnership**
**JMF Charity Series LLC**

**Real Estate**

**Real Estate Company**
**Partnership**
**CHR Properties LLC**

**Family Company**
**Partnership**
**JMF Properties LLC**

**Family Company**
**Partnership**
**Folsom Cabin LLC**



# MONEY MOVEMENT
### Entity Engineering



| | | | |
|---|---|---|---|
| Personal Travel — 5% | Land Trust Beneficiary (TBD LLC) | Home Expenses | |
| Fun Money — 5% | Management Company (Henry's Fork Management LLC) | Children's Payroll and Section 105 | |
| New House — 20% | Guaranteed Payments to JD and Micah | Personal Bank Account | |
| Emergency Savings — 10% | General Partner (Family GP LLC) | Vehicles & Maintenance | |
| Business (LLLP) — 50% | Limited Partner (TBD LP LLC) | Business Expenses | |
| Charity — 10% | Holding Company (Folsom Holdings LLC) | Investments & Life Insurance | |

# PREFERRED VENDORS & AFFILIATES
**Entity Engineering**



**TBH Tax, LLC**
(Your Accounting Firm)

### QWNTM Services, LLC

$499 Formation (One-Time/Each)

$17.77/Month Per Entity Registered Agent Fees

$99 Dissolution (One-Time/Each)

$99 Annual Filing Fee (Annually/Each

WY Registered Agent

### Penn Mutual

Services Included

Life Insurance Agency

### Firm Foundation

Services Included
(Wire Transfer Fee May Apply)

Private Lending

### TBH Tax, LLC

Services Included

Tax, Payroll, Bookkeeping

### New Jerusalem

Services Included

Real Estate Portfolios

### QWNTM Services, LLC

$3,000/Land Trust Formation
(Includes LLC Formation Costs)

Deed Transfers

Cost Segregation Studies

Turn-Key Land Trust Solutions

*Will work with outside vendors. Additional costs and timelines will apply.*



# Engineering Your Financial Powerhouse
## Reach Out to Your Client Ambassador

### Disclaimer

TBH Tax, LLC is not an "investment adviser" and does not provide "investment advice" or "investment recommendations" regarding any course of action, including without limitation as those terms are used in any applicable law or regulation. TBH Tax, LLC is not acting in a fiduciary or advisory capacity under any contract with you, or any applicable law or regulation. You will make your own independent decision with respect to any course of action in connection with TBH Tax, LLC's services, including whether such course of action is appropriate or proper based on your own judgment, specific circumstances, and objectives. You are capable of understanding and assessing the merits of a course of action and evaluating investment risks independently.

You should not consider any of TBH Tax, LLC's past or future statements to you to be promises or guarantees about the outcome of the services that TBH Tax, LLC provides to you, including the issuance of a tax refund. TBH Tax, LLC makes no such promises or guarantees. Your obligation to pay TBH Tax, LLC for services rendered is not contingent upon any particular financial or tax outcome.

*" I eagerly expect and hope that I will in no way be ashamed, but will have sufficient courage so that now as always Christ will be exalted in my body, whether by life or by death." Philippians 1:20*